HENRY D. CRUGER *v.* DOUGLAS and others.
(*Original Bill.*)

HARRIET D. CRUGER, by her next friend *v.* HENRY D.
CRUGER.
(*Cross Bill.*)

Equity has no control over husband and wife where there is no cause for separation or divorce except with reference to property.

Chancery cannot compel cohabitation or a restoration of conjugal rights.

Where a husband, immediately after marriage and without consideration, alone executed an instrument of settlement, whereby he released and conveyed to trustees the wife's real and personal estate: " *To hold and keep both the principal and interest thereof during the said marriage, exempt from his debts, contracts or control, to be managed and disposed of on her separate orders or receipts or by her deeds or will, so that she may enjoy and dispose of the same as it came from her parents and sister or may hereafter in any manner accrue to her in all respects as if she were unmarried ;*" and delivered the same to such trustees: *Held,* that the instrument was valid; that the statute against fraudulent conveyances, in requiring a consideration to be expressed, does not control an instrument which creates and passes the estate, title or interest: that a consideration is here implied by execution; and that a deed like the above is not to be deemed executory, promissory or as a covenant or agreement to do some future act.

Also, *held* : that the instrument is not void under the statute of uses and trusts : 1 R. S. 727 § 25 for, while the words, " *to be managed or disposed of on her separate orders or receipts or by her deeds or will, so that she may enjoy the same in all respects as if she were unmarried,*" would seem to give her all power as if she were a *feme sole* and the trustees be mere nominal parties, yet, when coupled with the words (applying to the trustees) " *to hold and keep both the principal and interest thereof during the said marriage, &c.,*" a requirement to perform active duties appears and makes the trust good.

A trust need not be clothed in the very words of the statute of trusts ; a substantial compliance is sufficient.

Equity ascertains object and design. It looks for substance, rather than at form. Where words admit of different meaning, it grasps at that which upholds, not that which destroys.

The wife by a deed (under the power in the above instrument) irrevocably transferred to her husband a half of the income of her estate, real and personal, for life and directed her trustees to pay it. *Held* to be a valid instrument; and that the disabling language of the § 63 of the statute of uses and trusts did not affect it : because, here is an appropriation only of the benefits resulting from the trust in a manner compatible with its object and which does not put an end to the interest of the beneficiary.

**1844.**

CRUGER
*v.*
DOUGLAS.

Although persons are alleged to have joined in conspiring to obtain the execution of a deed, yet (not being parties) they are competent witnesses.

A deed, free from fraud and made with a view to effect a family settlement, although voluntary, will be upheld in chancery—public policy and the peace of families encourages it.

*July* 24, 25, 26, 30, 31 ; *Aug.* 1, 2, 5 ; *Oct.* 16, 17, 18, 1844.

*Husband and wife. Settlement. Marriage Settlement. Jurisdiction. Fraudulent Conveyances. Voluntary Conveyances. Statute of Frauds. Uses. Trusts. Evidence. Witness. Deed.*

THIS case involved questions touching the validity and consequent effect of certain instruments on the properties of a married woman.

By the original bill, the complainant, Henry D. Cruger, showed that on the 29th day of June 1833, he was united in marriage in the city of New York with the defendant Harriet Douglas ; and that, from that period to the present time, they had continued to live together as man and wife, except as thereinafter mentioned ; and that, during such living together, they were inhabitants of this state. That at the time of their marriage, and for many years previous thereto, he was engaged in the practice of his profession with such success as to enable him to live in entire independence and with every prospect of an increasing and lucrative business. That his wife, at her marriage, was in possession of or entitled to a large personal estate, amounting to $100,000 and upwards, and real property estimated to be worth $60,000 and upwards ; and that she now was the owner of and entitled to an estate, which, if properly managed and reduced into possession, was believed to be worth $400,000 and upwards : of which $250,000 consisted of personal property. That, on his marriage, he became absolutely entitled to and invested with so much of the estate as was personal and the income of so much thereof as was real for life or during the marriage. That immediately after the ceremony of the marriage had taken place, he, of his own accord, executed and delivered the following settlement of the property to which his marital rights had thus attached :—

"A marriage having been solemnized between Henry D. Cruger, Junior, and Harriet Douglas, by means whereof he has acquired at law certain interests and rights in her property, the said Henry D. Cruger, Junior, hereby freely, fully and unreservedly releases and conveys all the estate, both real and personal, heretofore owned by her or which she

may hereafter acquire, and all his right, title and interest therein, to George Douglas, William Douglas, James Monroe and Robert Halliday, and to such substitutes as she may from time to time appoint, jointly and severally in trust to hold and keep both the principal and interest thereof during the said marriage, exempt from his debts, contracts or control, to be managed and disposed of on her separate orders or receipts or by her deeds or will, so that she may enjoy and dispose of the same as it came from her parents and sister or may hereafter in any manner accrue to her in all respects as if she were unmarried. In witness whereof, the said Henry D. Cruger, Junior, has hereunto set his hand and seal, at the city of New York, this twenty-ninth day of June in the year of our Lord one thousand eight hundred and thirty-three.

HENRY D. CRUGER, JR. [L. S.]

" Signed, sealed, and delivered, in presence of

" BENJ. McVICKAR, 496 Broadway, New York.

" WILLIAM MOORE, Col. College, New York."

The complainant also showed that the marriage settlement or instrument in writing under seal, having been so made and executed, was thereupon delivered to the trustees named therein or one of them then present and the contents thereof were immediately made known to the wife who, thereupon, surprised and gratified, of her own accord, in consideration thereof, verbally gave the complainant, in return, the entire income of the estate for life, in the presence of two of the said trustees and of others then present, who were specially called by her as witnesses; of all which the complainant was shortly after informed by the said trustees. That it was his full intention, in thus surrendering the property he had become entitled to by his marriage, to continue his professional pursuits at large, irrespective of his wife's fortune ; and that, as this gift rested in parol and was not reduced to certainty, he in no degree relied or acted upon it until one of the trustees, Robert Halliday, of his own motion brought the subject to the attention of his wife and represented to her the danger of leaving matters in so loose a state, as the declarations at her wedding would no longer

1844.

CRUGER
v.
DOUGLAS.

1844.

CRUGER
v.
DOUGLAS.

operate even as a nuncupative will.   Whereupon she signed and delivered the following order in duplicate, one to the trustees and the other to her husband :

"Bloomingdale, 15th July, 1833.

*To Robert Halliday, Esq.,*

As acting trustee and agent of my property, you are hereby authorized and requested to pay to Mr. Cruger, upon his written order or receipt, the income of my estate as it accrues.

Signed with all the heart of

HARRIET CRUGER."

Which order, direction and appointment was made and delivered by her of her own accord and was in confirmation and fulfilment of the gift made on the evening of their marriage.   The complainant charged, that by virtue of the order, direction and appointment so made and confirmed, he became absolutely and irrevocably entitled to the whole income of the estate, whether in possession or otherwise, for and during his natural life ; and that it was so received and understood by his wife, by himself and by the trustees, with the sole qualification that it was to be paid as it accrued—the power thus given him to receive the income being competent to his wife to confer under the settlement and there being no authority to revoke it reserved in the instrument creating the power.   That in order further to insure the income to him for and during his life, his wife shortly afterwards, to wit, on the twenty-fourth day of the same month, made and executed and delivered to him a certain other appointment in the nature of a last will and testament under seal, whereby she gave and bequeathed the principal of her property to her collateral heirs and the income thereof she gave to him for his life.   And he averred, that at the instance and through the persuasion of his wife and upon the faith and credit of the disposition of the income thus made by her in his favor, the same being abundant for all their wants, without his following any longer a laborious and engrossing occupation, he gave up his profession and withdrew from business in general ; and, at the request of several members of his wife's family and of herself, devoted

much time and labor to the recovery, improvement and management of their several estates, being six in number and of large amounts respectively, investigating, arranging and promoting the interests of the estates thus entrusted to his care, ascertaining, rectifying and adjusting the books, vouchers and accounts belonging to them for periods of from six to eleven years and examining and putting in order the muniments and proceedings appertaining thereto during that space of time. And that, in further discharge of the office he had thus undertaken, he, in the spring of 1834, embarked for Scotland, to look after what had been left them by an uncle twenty-five years before; and, being clothed with full powers of attorney, he remained six months abroad for that purpose; during which time he saved and recovered for their estates, including that of his wife, very large sums of money, which he transmitted to this country and had invested at seven per cent. interest, instead of from two to three per cent., at which it had been lying there for a quarter of a century. That previously embarking on this mission, he deposited in his wife's hands the order she had given him as above stated on the trustees of her estate for the income and, also, the deed of appointment in the nature of a last will and testament which she had executed to carry out the same object as before mentioned. That in course of the correspondence which ensued between them in a letter of July 16th, 1834, she said:—"The interest of all my property you shall have as long as you live." But that before he returned home he wrote to her under date of 29th September following, to explain that his purpose in leaving the order and will with her was to put it at her option to cancel the one and revoke the other; and that if, on his return, he found this done, he would resume the practice of his profession at large. That so far from availing herself of this opportunity or giving the least intimation that she wished the disposition of the said income made thereby should be in any way changed, shortly after his return she restored the order to his possession and he went on to receive the whole income under it, as theretofore, from the trustees. That on or about February 14th, 1835, she made and executed and delivered to him another deed of

appointment, in the nature of a last will and testament, to the same purport and effect, in respect to the disposition of the said principal and income, as by the one previously made, the latter being supposed to be defective. And he submitted that the same was further proof of the understanding and intent on the part of his said wife that, while the principal of her estate was to pass to her brothers and sister, the entire income was to be his for and during his lifetime. And he averred that he had, at all times, been willing to abide by and carry out this agreement in perfect good faith ; and that all he had ever asked for was that the counterpart of the contract as to the income should be kept in like good faith. In proof whereof, he proceeded to state that when the sum of $10,000 was awarded him in compensation for his services rendered to the estates whose interests he had been attending to, although the amount had been hardly earned and was all he was worth in the world and he had many better purposes to which he would gladly have appropriated it without adverting to his wife's large fortune or stopping at the consideration that it had been laid out as much for her benefit and enjoyment as his own, he called on the trustees to ascertain and report any excess beyond the income they might have expended since their marriage ; and on being certified that they had gone beyond it to the extent of $2,785 22, he immediately, in June 1835, replaced that amount in the hands of the trustees, to make good the principal of the estate. So, also, out of this fund, at the same time, he paid off to the trustees the sum of $1080 60, being principal and interest of money loaned by them on bond and mortgage to his uncle, Henry N. Cruger, because he considered the debt as then desperate. And he repaid to William Douglas (his wife's brother) the sum of $1000, borrowed from him shortly before for the purchase of horses for her use ; and, moreover, applied $1000 towards defraying current family expenses. All which was done to make good the capital of the estate, in consideration of and upon the faith of his having the whole income for life. That considering and believing this arrangement to be certain and final, upon the strength of it he determined to avail himself of the greatest advantage

the possession of wealth can give ; not idleness, but choice of occupation. That accordingly he made preparations to retire altogether from a profession he had long followed (not from preference, but on principle) and to embark actively in agricultural pursuits and, at the same time, to enter upon public life. That, in pursuance of this plan, with the full knowledge and approbation of his wife, he undertook the management of a large landed interest belonging to her estate, consisting of from 12 to 1500 acres, situate in Herkimer county in this state ; and against his own judgment and wishes, but to gratify her, he erected and furnished an appropriate residence on the spot, selected and according to the plans designated by herself, but, of course, for their joint use and benefit during life. That he was given the possession and control of this property with the full knowledge and concurrence of the trustees also and carefully and laboriously devoted himself to its management and improvement, whereby he soon doubled the rents and enhanced its value at least one-third ; and would, by this time, have made it yield from seven to ten per cent. instead of its present income of about three per cent. on its marketable value. Also, that, in like manner, whenever the opportunity had been afforded to him, he had uniformly added to the substantial and permanent value of the capital of his wife's property, although well knowing that, under the understanding above set forth, the fruits of his exertions were to enure, not to himself or to his heirs, but for the benefit of those who did not want it, who were making no returns even in favor of his wife and for whom he was suffering constant disparagement at her hands. Also, that on a subsequent misunderstanding with his wife as to money matters, notwithstanding all that had taken place, he instantly tendered to her again the order for the income of the estate ; thereby, by his own act, making it optional with her to revoke it and, in that event, proposed to resume the business of his profession ; instead of which, she gave him a confirmation of the order in the following form :

" The whole income of the property I derive from my father and uncle, to be paid under the order to you, spent by you for our mutual benefit and a general account kept

for me, if I call for it. The rents of the Herkimer lands to be paid me; the rest of the proceeds of my share of my sister's fortune to you, for your own sole use and no part or account of it ever given back to me. These will be confirmed by orders to my trustees.

Staten Island, 29th June, 1835.

HARRIET D. CRUGER."

For H. D. CRUGER, Esq."

And that to make no difficulties, he assented to this modification of the original order, but that, subsequently, his wife, from his having acted under it in one particular, in an entire mistake as to facts, but without asking any explanations or giving him the slightest notice, recalled the order from her trustees; and directed the agent to pay the income to herself, declaring, then, for the first time, that she had always intended the order to be revocable. After remonstrating against this breach of good faith and the intolerable state of incertitude and dependence to which it subjected him, he acquiesced in the revocation; but declining to occupy a position of false appearances, he left their expensive residence and taking accommodations suited to his own circumstances, invited his wife to join and share with him whatever his professional earnings might acquire. In consequence of this a long discussion ensued, in the course of which she wrote to him under date of July 27th, 1836: "I have but two clear and distinct wishes, as regards my property, namely, that you should enjoy with me and after me the entire income of it and my heirs the entire principal." And, subsequently, she herself referred all matters in difficulty to the umpirage of William Bard, Esq., conjointly with Captain John Whetten. Against the interposition of the former he protested in writing, on the ground of his being his uncle; and was willing that her own relatives, to whom he had already referred every thing, should make an adjustment; but, his wife waiving the objection, full information was laid, on both sides, before the arbiters and their decision was embodied in a letter from Mr. Bard to Captain Whetten, to the following effect:

" 27th Nov. 1836.

MY DEAR SIR,—I agree in the views expressed by you,

" this morning; and in the spirit of the proposition you left with me in writing. I hope our friends, forgetting entirely the past, will live the residue of their lives in affectionate harmony. A bystander would say they have happiness within reach—permit me to hope they will not reject it. It is proposed and I understand Mrs. Cruger assents, that the debts to the estate of Mrs. Cruger, which have accrued by loans to Mr. Cruger's family, shall be the property of Mr. Cruger and that the debts so created to the estate shall be paid by a sum taken out of the semi-annual income, to be accumulated until the whole debt is paid. Mrs. Cruger's wishes should be complied with on this point; though, knowing no use she can have now or in future for money, but to promote her own pleasure and happiness and that of those around her, I would advise her not to sacrifice either nor even her convenience to an imaginary duty, to those whose wealth puts them far beyond the need of her assistance. If, in the deduction of seven per cent. semi-annually, she thinks she will not feel the want of income, there can be no objection to retaining it—but she must agree to live within the remaining income; and to do so, I would not advise her to refuse herself the gratification of a wish, purchased by the giving up the seven per cent. to the object she has in view. I do not think it worth the sacrifice of a wish. With the above deduction, the remaining income and, after the debt is paid, the whole income should be divided into two parts, over one of which (whenever desired by her) Mrs. Cruger should have the absolute control and over the other Mr. Cruger should have the absolute control during his whole life; and this should be put, by legal papers, on such a footing that neither party can ever alter or amend this disposition of the income and not be left to a mere understanding between the parties. There will be no permanent peace unless this is irrevocably fixed and such papers drawn and executed as may be necessary for the purpose. It should be an understanding on the part of Mrs. Cruger, but still leaving her the final control over half the income, that her husband shall have the management of her whole income, to spend it for their mutual comfort and support, without accounting for the manner in which

" it is spent, further than may be done and, where there are right feelings, is always done, in the mutual confidence between man and wife in whatever concerns their mutual interests.    Whether Mr. Cruger receives the income or whether an agent receives it and deposits it in his name, can be a matter of no consequence; some expense may be saved if he does it.   I see no other difference in the two modes. In giving the above opinion, I have endeavored to free myself from partialities of all kinds and to give such counsel to two individuals, in whose happiness I feel a deep interest, as I think is most likely to secure it.

Truly yours,

(Signed)                    WILLIAM BARD."

And the complainant further stated that, with this decision, he was, at the time, perfectly satisfied, although it was an interference with his wife's absolute gift of the whole income and withdrew one half of it from his ownership; still, it was reasonable and fair and consistent with the relationship of husband and wife—he therefore acquiesced in it, hoping that it would lead to certainty and permanent peace. And he insisted that his said wife was bound to submit implicitly and to carry out, literally, this decision of her own chosen arbiters, made upon a full hearing and unqualified submission of all matters in controversy.   On the contrary, she wholly refused to comply with the award of the said umpires—and in particular, she declined executing the legal papers considered by the referees so indispensable to secure the object of all parties; and in lieu thereof, addressed a letter, under date of November 30th, 1836, to her sister, Mrs. Elizabeth Mary Monroe, in which she used the following language : " Know then that, though the offer has been twice rejected by Mr. Cruger, I now assign to him, willy nilly, all the evidences I hold, not only of the advances made to Messrs. N. and L. Cruger, but those to himself, his sister, his brother-in-law, his uncle, and his uncle-in-law, which, on reference to Mr. Halliday, I believe you will find is getting over $40,000.   The most of this, my dear sister, is out of the principal of my estate ; but you (the only one of my three heirs who know my circumstances) have urged me to it. Of myself, I never would have signed away or even

compromised the collateral birth-right; you, George, and William, have—and when the post-nuptial settlement was made, I thought I had secured them. I also mean to relinquish my plan of reserving a per-centage of my income to gradually restore the sums taken from my principal, which would have (had I lived long enough,) again given you the unimpaired whole I had received by my birth-right. Thus Mr. Cruger remains in the full possession of my whole income, lessened only by the non-payment of interest by some of those of his family, to whom he has made loans. I never will sign any other papers than those that are signed, my will, and my revocable order; but I have said to Mr. Whetten, and will say to all those who deserve the respect, ' when you see me revoke that order (let Mr. C. act as he will,) you may give me up, for I will then be given up of God !' Mr. C. in signing the settlement, has signed the only paper in my favor I ever will receive from him; that secures your rights, in which are wrapped up my duty to my deceased parents. And now to this solemn paper I put my name.

(Signed,)          HARRIET DOUGLAS CRUGER."

On which paper was moreover endorsed :—

" I truly believe my sister is sincere in the declarations made in this letter, and that she will strictly adhere to them throughout her life.

(Signed,)                    E. M. MONROE."

" I have entire confidence in the above sentiments.

(Signed,)                    JOHN WHETTEN."

That the said letter was put into his hands as a substitute for a regular deed and as having the same validity in honor and good conscience. But, warned by the prophecy of the arbitrators, that there would be no permanent peace if matters were left to a mere understanding and not irrevocably fixed by papers necessary for that purpose and apprehensive, himself, from the experience of the past, that it was a dangerous power to leave in his wife's hands, he, at first and for some time, was reluctant to receive so informal a document—but being urged by his wife's relatives and considering that the faithful performance of the stipulations it contained were guarantied by her own and only sister and

by her venerable friend and chosen adviser, and by an im-precation of her God, for the sake of peace and in the hope that, by indulging her humor, he would conciliate harmony, he, at length, acquiesced and again abandoned his intention of returning to the bar, and went on with the mode of life he had preferred, the permanent profits of which were to re-dound to his wife's heirs.

That the loans to his family, referred to in the above re-cited decision of the arbiters, and thus absolutely assigned by his wife to him, whether he would or not, consisted ;— 1st. Of advances made to his brother, Lewis Cruger, to enable him to purchase a sugar plantation in the state of Louisiana. These amounted to $20,060, the re-payment of which was secured by bond and mortgage on the property— and the debt he believed to be perfectly safe, although it would occasion the entire sacrifice of the property, were the said mortgage enforced at the present time. 2d. A loan to Nicholas Cruger, also a brother, of $10,000, to enable him to enter into mercantile business in New York; for which, having become unfortunate in business, he was en-tirely unable to respond. 3d. The sum of $1500, loaned to his uncle Henry H. Cruger, on his bond, secured by mort-gage on a house and lot in the village of Angelica, and 362 acres of land in the county of Alleghany, state of New York. This debt he believed to be safe. 4th. A bond given by him, to the trustees of his wife's estate, for $9,500, to cover all other advances from the principal for loans to his rela-tives and expenditures beyond income up to the period of its date, to wit, June 29th, 1836. The loan to his uncle, Henry N. Cruger, of $1000, had been paid off, as above stated. That these loans were made at the instance and on the free-will offer of his wife, who had always taken full credit for them, as acts of kindness and liberality on her part; that they were, moreover, arranged with the knowledge and concurrence of her acting trustee and agent, Robert Hal-liday; the persons to whom they were made, always giving every security in their power. And that the complainant, although not called upon in each instance, except that of the loan of $1500 to Henry H. Cruger, became himself re-sponsible, by either giving his own bond or joining in those

given by the other parties—thus fulfilling, conscientiously
and to the letter, as far as in his power, his share of the
agreement to preserve the principal of the estate untouched,
in consideration and on the faith, as he expressly alleged, of
his receiving the whole income during his life.    That, al-
though his wife had repeatedly given him the bonds and
mortgages above mentioned, as declared in her letter to her
sister, he always declined receiving them, on the ground
that it was a departure from the understanding between
them that he was to have nothing of the estate but its in-
come : and he had always been willing, so long as this por-
tion of the agreement was kept in good faith, to abide by its
reciprocal obligation.    But he submitted that, failing this
consideration, he was fully entitled to the benefit of what-
ever deviations might have supervened in his favor.    That,
considering the arrangement last made as final and such as
he might rely on under the circumstances with implicit con-
fidence, he went with his wife to pass the summer of 1839,
at their country residence in Herkimer county, during which
time he was actively and effectively occupied in the im-
provement of the property under his management, in the
well assured expectation that he was to reap the fruits of
his labors, at least during his own day and generation.
That in the fall his wife left him, to make a visit to her bro-
ther on Long Island and to prepare their residence in town
for the winter—and in preparing to follow her, in order to
pay off the workmen on the place and the bills contracted
during the season for family expenses, he drew upon the
agent of the estate in town, through a bank in the neighbor-
hood ; which draft came back protested for non-acceptance,
although there would have been abundant funds in his
hands to meet it at maturity.    That, at this time, Francis
Brown was agent of the estate, who stated, by letter, that he
had received instructions not to pay him the quarter's in-
come next accruing, but to appropriate it in a different chan-
nel : and hence it was that the draft had been dishonored
and he was left destitute of the means not only of meeting
the engagements he had entered into on the faith and credit
of having the whole income at his disposal, but of funds to
defray the current expenses of his household.    Upon inquiry,

he then ascertained that the order to the agent, thus divert-ing the income from his control, was given by William Douglas and Robert Halliday, two of the trustees, at the in-stigation of his wife, but without the concurrence of the other trustee, James Monroe, whom they did not venture asking to join in so outrageous an act, although he had pre-viously been co-operating with them and was at the time in the city if not in the very house where and when the said order was signed. And thus the complainant, after all that had passed, was made to feel that he was at the mercy of the capricious monied tyranny of, not only his wife, but, at second-hand, of the trustees also. And he averred that his ac-tual though not direct revocation of the Order in his favor for the whole income took place in his absence, without consulting his convenience or giving him the slightest no-tice ; and was made on a mere pretext of paying off the in-terest on a debt due by his wife's estate to that of her sister Margaret Douglas the younger, deceased—although that estate was at the time indebted to his wife's in a much larger sum. He then insists that whilst the Order on the trustee to pay him the income of the estate was in force, which his wife had so solemnly and explicitly pledged her-self never again to revoke, it was not competent for her trustees, nor even herself, to interfere with any part of the said income, nor to divert a dollar of it from his hands for any purpose whatever ; and that this could be done only by a violation of good faith and by a breach of a positive con-tract. And when it was thus done, he earnestly remonstra-ted with his wife and with her trustees and appealed to her own family and friends to rescue her from a course of con-duct so perfidious and dishonorable and her husband from a state of such harassing and degrading insecurity and de-pendance. Whereupon she gave to her brother-in-law and trustee, James Monroe, full authority to arrange matters as he might think proper and advisable,—engaging to abide by such arrangement when completed. And in earnest that she would do so, she placed in his hands an order or stipu-lation, of which the following is a copy :

"NEW YORK, 26th October, 1839.

*James Monroe, Esq.*, 28 Park Place:

Dear Sir :—I hereby give to my husband, Mr. H. D. CRU-GER, the power to draw the whole of my present income as it accrues during his life.

(Signed,)                    HARRIET D. CRUGER.

" The above is different from my former order one syllable of a word—that was meant to be revocable, this is irrevocable."

And the complainant insists that this order, thus given, was an admission that she had, as far as in her power, revoked the former order and that this was all that was necessary as a remedy for any difficulties. Being clothed in this way with plenary authority, Mr. Monroe wrote to him to inquire what settlement would meet his views ; and in answer, he declined expressing any wishes or opinions whatever upon the subject, preferring to leave the whole matter to his wife and her friends—only asking, that whatever was done should be done in a definitive and permanent form, so that he might know what he had to depend upon and the only real cause of difficulties in his married life might be taken away finally and for ever. And, at the same time, he released and absolved his wife from all previous promises and engagements, and offered, if she chose to withdraw the whole income from him, to acquiesce—and, even then, to go to work and provide for himself as best he might.

That thereupon, the said James Monroe had a deed prepared, which was duly executed by Mrs. Cruger and acknowledged by her before a commissioner, on an examination separate and apart from her husband, as her own free and unbiassed act, in the words following :

" *Know all Men by these Presents*, That I, HARRIET DOUGLAS CRUGER, the wife of Henry D. Cruger, Esquire, for divers good causes and considerations me thereunto moving, and by virtue of my marriage settlement with him, and of every power and authority enabling me so to do, have settled upon, and limited and appointed to, and by these presents, do settle upon, and limit and appoint to my said husband, all and singular the net annual or other periodical income of my present property and estate, both real and

1844.

CRUGER
*v.*
DOUGLAS.

personal, which is now in the hands and under the control of my trustees under the said settlement, to have and to hold the same unto my said husband, for and during the rest, residue, and remainder of his natural life, to and for his own use and benefit; meaning and intending to except from the said settlement hereby made my share in the income of my mother's estate and in that proceeding from my rights in law and equity under my sister Margaret's will.

In witness whereof I have to these presents set my hand and seal this second day of November in the year of our Lord one thousand eight hundred and thirty-nine.

    Signed  HARRIET DOUGLAS CRUGER, [L. S.]
Sealed and delivered in presence of

  WILLIAM J. PORCTOR,

  JAS. MONROE,

  ROBERT HALLIDAY,

  GEORGE W. STRONG,

  WILLIAM BARD."

Which deed so executed in the presence of her relative, William J. Proctor—her trustees, James Monroe and Robert Halliday—her solicitor, George W. Strong—and her former umpire, William Bard—was forwarded to him by her then umpire, chosen and empowered by herself, the said James Monroe, as an instrument made in good faith and for the best of purposes, valid, binding and conclusive; and was so received by him, who, immediately on its coming to hand, executed, acknowledged and remitted to the said James Monroe an obligation of the following purport:

" *To  George Douglas,  William Douglas, James Monroe and Robert Halliday, and their successors :*

By deed of appointment, bearing date the second day of November, one thousand eight hundred and thirty-nine, my wife, HARRIET D. CRUGER, having settled upon me for life, all and singular the net annual or other periodical income of her present property and estate, both real and personal, which is now in your hands and control as her trustees, under her marriage settlement, with the exception of her share in the income of her mother's estate and of her rights in law and equity under her sister Margaret's will: Now know ye, that I, HENRY D. CRUGER, for divers good

causes and considerations me thereto moving, by these pre-
sents do authorize and empower you, as trustees of the said
estate, to retain and pay over to the said Harriet D. Cruger,
for her own use and benefit, as often and whenever during
her lifetime she shall in writing so require, and upon reason-
able notice to me given, so much of the said income thus
appointed and settled as will. with what she has above re-
served to herself, constitute one-half of the whole income of
her estate for the time being.

In witness whereof I have hereunto set my hand and
seal this fifth day of November, one thousand eight hun-
dred and thirty-nine.

(Signed,)　　HENRY D. CRUGER, [L. S.]

Sealed and delivered in presence of
> JONAS CLELAND,
> LAWRENCE HARTER,
> EPHRAIM TISDALE."

That his motive in thus securing a half of the income to
the ulterior disposal of his wife was not from any doubt but
that she was bound to give him the whole, but simply be-
cause the arbiters, whose decision in 1836, she herself had
set at nought, had recommended that this should be done ;
and he was desirous of enjoying the approbation of his
wife's family and friends and, if possible, of rendering her
satisfied.　He admitted. however, that he did at the time
express his regret and that he has always regretted that she,
in any instance, has not fulfilled her obligations of honor and
truth in giving him the entire income and that, on this occa-
sion, she kept back part of that income and limited the ap-
pointment to that of her then property.

That nine or ten days after the deeds had been so ex-
changed between James Monroe and himself, his wife
wrote to him that her referee entirely approved of the ar-
rangement effected ; and the more so because he had acted
so handsomely in returning a portion of what had been con-
veyed to him and that she herself would abide by it lite-
rally.　Notwithstanding all which, when he came to town
to reside with his wife, he found she had left their home
and gone to live with one of her brothers : giving it out that
she would not live with her husband so long as he retained

1844.

CRUGER
*v.*
DOUGLAS.

the deed prepared, executed and delivered to him, even under all the above recited sanctions. That he, thereupon, made use of all the arguments and persuasion in his power and availed himself of the intercession of her own friends, to the utmost, to induce her to return to her duties and reside with him. But finding it all in vain, he made the following endorsement on the deed:

"*Know all Men by these presents,* That I, HENRY D. CRUGER, for divers good causes and considerations me thereto moving, do hereby cancel and surrender this deed and release and relinquish all right, claim and interest under and by virtue of the same. Witness my hand and seal, at the city of Washington this 22d day of February, 1840.

(Signed)        HENRY D. CRUGER. [L. S.]

Sealed and delivered in presence of

   FRANC'S STOUGHTON,

   JOHN BARD,

   JAMES MONROE."

And thus, for the fifth time, he gave up the whole income; and, although thrown out of his profession and connexions in business, by his wife's treacherous conduct, he went forth penniless into the world afresh, to earn that honorable independence he had always enjoyed before marriage through his own exertions and to obtain the means of supporting her apart from her own property and to pay off the liabilities he had incurred to her estate as above mentioned; intending, whenever he had it in his power, to offer her a home, to invite her to enjoy, with him, all the rights and considerations due to a wife by the feelings of nature and the laws of our country, regardless of birthright, hard earnings or collateral heirs. He next shows, that, although the only obstacle she pretended to be in the way of living with her husband was thus removed, by his cancelling and returning the deed, as above stated, yet his wife never came near him, nor made any arrangements for their living together. On the contrary she not only, by her course towards him, exposed him to all manner of suspicions and slanders, but busied herself to injure him by all the means in her power; and, with this view, entered into a correspondence with his brother-in-law, Gen'l James Hamilton, with whom he was

then residing in Charleston, South Carolina; in the course
of which correspondence, however, she wrote to said Ham-
ilton, on March 14th, 1840, as follows: ·

"At present, I will confine myself to giving you the ex-
plicit answer you want for the question you propound; and
to informing you of how I am acting and mean to act, under
the annulled deed. This I wished to do, the moment it was
returned; but my sister advised me to give it a little more
consideration. You say 'he has, with a liberality and mag-
nanimity which few men, under similar circumstances,
would have practised, given up a legal claim, guaranteed by
the solemn sanction of a deed, to the whole income of your
estate.' Now, sir, when the time arrives, that this magnan-
imous act puts the income again in my power, which cannot
be till the debt due the younger children and the one I
claim as trustee to my sister's estate, are paid, I intend to
order it paid to Mr. Cruger: and, he refusing, it shall be
offered to any other member of Mr. C.'s family who will
take it. For I will not touch a dollar of it again, nor have
I done so since I gave the deed: living on money bor-
rowed from the remainder of my sister Margaret's estate,
undivided, secured by a mortgage on this house."

That whilst remaining in Charleston, arranging his plans
with the advice of his friends, either to emigrate or to es-
tablish himself in some business, information was received
that, in consequence of his wife's separating herself from
him and his having left New York, all sorts of injurious
reports and suspicions were afloat concerning him; such
as, that he had squandered all his wife's fortune—that he
had gone off with a large amount of it in his possession—
that he had been unfaithful to her and had ill-treated her.
All which were utterly untrue. That he came back to the
city of New York in June, 1840, prepared to re-unite himself
to his wife. But, on his arrival, found that instead of wait-
ing for him, she had, to avoid him, gone off shortly before
to her country residence—where she remained apart from
him and without his consent during the summer. There-
upon he occupied himself in refuting the misconceptions and
suspicions he found rife in relation to his conduct as a
married man and in reference to his wife's property. And,

whilst so engaged, as was natural, the mediation of mutual friends was offered to bring about a re-union between his wife and himself. And, he offered to leave matters to the decision of his wife's sister, Mrs. Monroe, of her cousin, Mrs. Eliza C. Kane, and of her friend and agent William Whetten, Esq.: but she refused her concurrence in such reference and again placed herself in the hands of William Bard, Esq., above mentioned, authorizing him to do as he thought proper.

That Mr. Bard, in consequence thereof, but believing it impossible, from the representations made to him by her, that they could ever live together again—and yet considering that he, the complainant, was entitled to some indemnity, at least, for the serious injury he had sustained in giving up his profession on the faith of the gift to him of the whole income of the estate—had a deed prepared and executed, in the words following :—

"Know all men by these presents, that I, Harriet D. Cruger, the wife of Henry D. Cruger, Esquire, by virtue and in pursuance of the power and authority in that behalf contained in my post-nuptial settlement with him and by virtue and in pursuance of every other power and authority enabling me so to do and for divers good and sufficient causes and considerations me thereto moving, have irrevocably assigned, transferred, limited and appointed and in and by these presents, I do irrevocably assign, transfer, limit and appoint to my said husband, for and during the rest, residue and remainder of his natural life, out of the net income of my separate fortune and estate, a clear and net annuity of three thousand  dollars a year, free of all and any abatement and deduction whatsoever, payable quarter-yearly, in four equal instalments ; that is to say, on the tenth days of August, November, February and May, in each year—commencing the first instalment immediately upon the execution and delivery of these presents. Which annuity is not to be construed as impairing or in any way affecting any provision which I have made or which, at any time or times hereafter I may make for him, in and by my last will and testament or other instrument of appointment in the nature thereof. And I hereby fully authorize

and empower him, immediately on the receipt of these presents or at any time thereafter and on the tenth day of every November, February, May and August thereafter, to draw at sight on my trustees or the agent of my estate for the time being for the said sum of seven hundred and fifty dollars; which drafts, so to be drawn by him, I do hereby fully authorize and direct my said trustees or agent for the time being to duly honor and discharge upon sight thereof. And I do hereby assume upon myself the collection of all debts, dues and demands due or belonging to me or to my estate; and I do hereby fully acquit, exonerate and discharge the said Henry D. Cruger his heirs, executors and administrators of and from all debts, dues, claims and demands now due or owing by him to me or my said trustees or estate and all further or future responsibility or liability touching the same or any parts or part thereof.

In witness whereof I have to these presents set my hand and seal this seventh day of September in the year of our Lord one thousand eight hundred and forty.

(Signed) HARRIET DOUGLAS CRUGER. [L. S.]
Sealed and delivered in presence of
MOSES SHAW.

(Acknowledged before a magistrate in Herkimer County, the seventh day of September, 1840.)

That when this deed was sent to him by Mr. Bard, he returned it to him, with a remonstrance against its going into operation, on the grounds that it was not a fulfilment of his wife's promises, but a departure from truth and moral obligation—that it was a deed for separation and not for union. But, as Mr. Bard declined interfering any further, he consented to receive the said deed, inasmuch as it embodied the principle of making him secure and independent; and, in the hope that by acquiescing, in such an arrangement even, he would be able to live with his wife and at peace; he immediately went to her at her residence in Herkimer County—and this, the sole, real obstacle in the case, being adjusted all other difficulties vanished—and they were re-united and returned and took up their residence together in the city of New York for the winter.

That, being thus limited to but about one-fifth of the income, immediately on his return to the city he re-opened his office and resumed the practice of his profession, which he has assiduously followed to the present time ; attending diligently to whatever business had been entrusted to him, in the sincere desire to increase his means. But in this he had, as he was apprehensive, failed almost entirely; both because he had been out of business for so long a time and because, as the community cannot comprehend why his wife should be locking up her large property or keeping it for heirs who do not need it from a husband who does and against whom she has nothing to allege, they cannot be made to believe that he is in any want of their custom. He next showed that, under this division of the income, his wife received and disposed of the rest of it as she pleased and often in large sums against his advice and approbation. And, although she would not live with him, while the arrangement made between him and the aforesaid James Monroe, by which he was entitled to one-half of it, was in existence, yet, when his share was reduced to a fifth, she was content to do so ; and they resided together, for a period of ten months and upwards harmoniously and as a man and wife should do. During which time she never, even by a revocable order, authorized him to receive anything beyond what the last deed of appointment gave him, notwithstanding all her avowals, protestations and pledges that he was to have the whole income and that she never would take any part of it back nor use a dollar of it herself, except as derived through him as her husband. Nevertheless, he neither interfered nor complained under what he could not but consider as wrong in her and disparaging to himself, but continued the pursuit of his business and the discharge of the duties of life, faithfully and conscientiously, wishing to make any pecuniary sacrifice in the hope of living with his wife in harmony. That, during the continuance of this state of things, doubts having arisen on the subject of his wife's power of making a will which would be a valid disposition of the income arising from her real estate and from the portion she was entitled to in her mother's property the said will, made as hereinbefore stated,

was submitted to her solicitor, George W. Strong, Esq., who
gave it as his opinion that the bequest to him of the income
from the real estate was void ; and that, although she had
the power of giving the principal of what she was entitled
to under her mother's will to him, she could not, by the
terms of that will, dispose of the income of such portion in
favor of any one.   That, on reading this opinion, his wife
appended to it the following remarks, in her own hand-
writing and signed by her and delivered the same to him
as declaratory of her intentions, as they had always and
still existed :

" New York, 29th January, 1841.

It seems, by the above opinion, that the intention of my
whole life, namely, that ' my husband should enjoy, to the
end of his life, the entire income of my estate,' would have
been defeated, by complying with that husband's wish to
have his settlement post-nuptial, if I had died before the
accidental discovery of the danger—I say danger only, be-
cause I think my brothers and my sister would never have
interfered with the letter of such intention—when they
know so well its spirit, for all the years of my life, since I
was fifteen.  Now, recommending him to this knowledge,
I believe I must leave him to the stead of his caution, ante-
nuptial.  My mother's will authorizes me to dispose of the
capital of my share of the property : but my own will, as
above declared, forbids my availing myself of this autho-
rity, except in favor of her descendants ; and their respect
for my loyal wish that the one who had stood in that rela-
tion towards me, should, as my other self, enjoy, with me
and after me, all the part of my mother's estate or any
estate I consider belongs to any one, namely, the *income*, I
must submit ; and not defeat her intention.   George, Wil-
liam and Betsey Mary Douglas will never institute against
my husband for taking the whole benefit I wished to leave
that husband.   Their wives or husband may : when he
must defend himself ; as we did against uncle James' sons-
in-law and George against his brothers-in-law.

(Signed)                    HARRIET DOUGLAS CRUGER."

That, while thus living with his wife, of a sudden and

1844.

CRUGER
v.
DOUGLAS.

without any previous mention to him of the subject, by her or her trustees, he was served by Frederick De Peyster, Esquire, then and now agent of the estate, with a copy of an order, signed by the trustees, George and William Douglas, dated March 19th, 1841, requiring him to collect all arrearages of interest upon the bonds and mortgages belonging to the estate and, in case it should become necessary, to foreclose the said mortgages and to collect both principal and interest—the said order having reference to the bonds and mortgages given by the complainant's relations to the estate, as hereinbefore particularized. The said bonds and mortgages were in the complainant's possession and had been so ever since the assignment of them by his wife, in her letter to her sister of November 30th, 1836.

That, when the call upon him was persisted in to deliver them up, all he required, after asserting his right to them, was a written order from his wife; and, immediately upon its being produced, transferred the custody of them. And he submitted that the object for which he parted with the possession of the said bonds and mortgages having failed, the property in them remained in him and they should be re-delivered to him accordingly. The complainant, also, stated that his said wife, of her own accord and voluntarily, executed a deed, a copy whereof is subjoined:

"Know all men by these presents, that I, Harriet D. Cruger, the wife of Henry D. Cruger, Esquire, by virtue and in pursuance of the power and authority in that behalf contained in my post-nuptial settlement with him and by virtue and in pursuance of every other power and authority enabling me so to do and for divers good and sufficient causes and considerations me thereto moving, have irrevocably assigned, transferred, limited and appointed and, in and by these presents, I do irrevocably assign, transfer, limit and appoint to my said husband, for and during the rest, residue and remainder of his natural life, the one equal half part of the net income of all and singular my separate fortune and estate, both real and personal, commencing on the first day of November instant, inclusive. Which provision hereby made for him by me is not to be construed as impairing or in any way affecting any provision which

I have made or which at any time or times hereafter I may make for him in and by my last will and testament or other instrument of appointment in the nature thereof. But, the provision hereby made is to be accepted by him and is intended by me in lieu of the provision of an annuity of three thousand dollars, which I made for him in and by a certain instrument, executed under my hand and seal the seventh day of September in the year one thousand eight hundred and forty. And I do hereby fully authorize and direct my trustees under the said settlement or the agent for the time being of my estate to pay to the said Henry D. Cruger the said equal half part or moiety of the net income of my said fortune and estate, during the residue of his natural life. And I do hereby assume upon myself the collection of all debts, dues and demands due or belonging to me or my estate. And I do hereby fully acquit, exonerate and discharge the said Henry D. Cruger his heirs, executors and administrators of and from all debts, dues, claims and demands now due or owing by him to me or my said trustees or estate and all further or future responsibility or liability touching the same or any part or parts thereof. In witness whereof I have to these presents, set my hand and seal this nineteenth day of November in the year of our Lord one thousand eight hundred and forty-one.

    (Signed)       HARRIET DOUGLAS CRUGER. [L. S.]
Sealed and delivered in pres-
   ence of (the word "fully"
   on 1st page, was interlined
   before execution.)
     WM. L. MORRIS,
     WM. DOUGLAS,
     ELIZA G. DOUGLAS.

(Acknowledged before a commissioner of deeds the twentieth day of November, 1841.)

 That, during the summer and fall of 1841, being compelled to remain in town to attend to his business, it was his wish and he requested his wife to stay with him—but she left him and went to the house he had built in Herkimer county and in this, to gratify her, he acquiesced in the first instance. But, on a second occasion, when she had returned

1844.

CRUGER
v.
DOUGLAS.

1844.

CRUGER
v.
DOUGLAS.

home, he forbad her leaving him again; notwithstanding which, in the beginning of September she, a second time, departed for the country and had ever since lived apart from him—thus not only holding four-fifths of the income of the estate at her separate disposal, but exempting herself entirely from the authority and personal control of her husband. And it was whilst she was so beyond his influence and when he had not even seen her for a long time that she executed the deed of appointment last above set forth. Which deed was prepared by George W. Strong, Esq., then and for a long time previous the solicitor and confidential adviser of his wife and of her trustees—who, before it was executed, submitted a draft of it to him, who candidly stated his objections to it. But he was informed unless this deed was accepted none other would be executed—and that, on a surrender of the one in his possession, this would be substituted in its place; upon which he consented to receive the latter, and in consideration of its delivery to him, as a valid and complete instrument, he accordingly gave up, in exchange, the one appointing him $3,000 a year from the income of the estate for life. That, after the existing deed of appointment was delivered to him, he applied to the agent of the estate for a balance sheet, by which he could become informed what the half of the income amounted to. And although he had repeatedly himself and through his solicitors made similar applications to the agent and the trustees, they refused to furnish him with a copy of said accountant's report or to give any information concerning the estate in their charge subject to the operation of the said deed of appointment in his favor.

That although the trustees, through their agent, with the full knowledge and consent of his wife, had, from time to time, during the past twelve months, made payment to him under the deed and had, in various other ways, recognized, acted on and confirmed the same, yet the trustees had recently wholly refused compliance and had repudiated the contract, sometimes pretending that it was void as having been made under a post-nuptial settlement and at others, that it was defective because the trustees were not parties to it

and especially that it was not valid, as having been procured
by duress and coercion.   All which he denied.

The complainant charged that the present trustees of the
estate had been and were wholly regardless of their duty to
manage it well and make it as productive as possible; and
that there was a large amount of the capital of the estate ly-
ing dead or producing inadequate returns and much of its
income in arrears and uncollected.   And, in particular, he
designates:—1st. A large tract of land in the state of Vir-
ginia.   2d. Three lots near Fourteenth-street in the city of
New York.   3d. The great body of the land in Herkimer
county.

But chiefly, that his wife became entitled on the 29th of
June, 1840, under the will of her mother, the late Mrs. Mar-
garet Douglas, to an annuity, payable semi-annually, of
from 3 to 4,000 dollars a year; which the trustees had hith-
erto neglected to gather in from the trustees of Mrs. Douglas'
estate, although the said estate had at all times been abund-
antly able to pay it.   Also that his wife was entitled to receive
from the estate of her late sister, of which she, with the said
George and William Douglas, were trustees, a large sum of
money amounting to $10,000 and upwards.   And that his
wife had a just claim against the said George Douglas, for
between 50 and 70,000 dollars, for a disproportion of their
uncle's estate, irregularly obtained by him.

That one of the trustees appointed by the complainant in
his post-nuptial settlement, Robert Halliday, was dead;
another of them, James Monroe, had resigned and been re-
leased from the trust; and that the said George and William
Douglas were the sole remaining trustees.   That the com-
plainant named them originally as such merely out of compli-
ment and expressly created the trust, joint and several, that
they might not be, except in the last emergency, called on to
act.   For that, indeed, they were wholly ignorant of business,
and entirely incompetent to perform the duties of trustees; in
addition to which, they occupied the incongruous relation of
*cestuis que trust* also, inasmuch as their sister, besides
making her will to that effect, had uniformly declared that
the principal of the estate in their charge, was to be theirs,
after the death of herself and husband.

1844.

CRUGER
v.
DOUGLAS.

That after the deed, appointing to him one half of the income, had been delivered to him, as above mentioned, he continued to occupy the house that had always been the residence of his wife and himself in the city of New York, in readiness to receive her, whenever she chose to return home; but that she refused to do so, and persisted in living with one or the other of her brothers. That, upon going to the, south in February, 1842, of his own impulse and with the advice of his wife's sister he addressed to her a kind and affectionate letter, which he left in the hands of the Rev'd. W. W. Philips, by whom they were married, urging her to return home and be there to welcome him when he came back. This letter, his wife refused even to receive; notwithstanding which, he, before starting on his return, wrote another letter, addressed to Mrs. Monroe, to be shown to her sister—pointing out the duties of a wife, the serious injuries she was inflicting on him and the sin she was committing herself, and entreating her to be at home to receive him; but it was all in vain. And he, finding that she could not be prevailed upon by any appeals to feeling, to reason or to a sense of duty, determined no longer to live in the house alone and, therefore, notified the trustees of the estate, in due season, that he should not continue to occupy their town residence after the first of May ensuing—and that they might either sell or rent it, as would be most advantageous to the income. In like manner, and for the same purposes and none other, he had given up to them possession of the house in Herkimer county: reserving to himself the right, in each instance, of occupying either or both of them whenever he might think proper, in the event of their not being so disposed of. And holding them, the said trustees, responsible for whatever ought to be the avails to the estate. At the same time that the complainant thus declined to live alone in these houses, he avowed his readiness to occupy them with his wife; declaring that, although he should not compel her to live with him, he never would himself consent to a separation and expressed his decided disapprobation of her residing in them without him; considering it but proper, if she withdrew from his protection, that she should remain under that of one or other of her

brothers. In despite of all which and in defiance of his just authority as her husband, his wife had passed a great part of last summer by herself in the house in the country: and was now living apart from him. That he had at all times been ready to live with his wife, in performance of his duty, faithfully and kindly, according to their marriage contract, the laws of the country and the precepts of their religion; but that she had wilfully and maliciously deserted and perversely and obstinately avoided him and refused to fulfil her matrimonial obligations—thereby depriving him of her society, destroying their home and grievously injuring his feelings, his rights and his character. And he averred and charged that there was no just reason or cause whatsoever why his said wife should be unwilling or refuse to live with him. That he was no party to any deed or contract made subsequently to his cancellation of February 22d, 1840; but had accepted of them or acquiesced in them, whether for a fifth or a half of the income, for the sake of that union and harmony which he had not found in return.

That he had been advised by his counsel that the post-nuptial settlement, hereinbefore set forth and therefore insisted, that said post-nuptial settlement was wholly void and repugnant to the revised statutes of the state of New York and of no force or effect upon his rights as the husband of the said Harriet D. Cruger; and that he was entitled, as such husband, to the full and entire possession, control and ownership of all the personal estate in any manner owned or claimed by the said Harriet D. Cruger and also of all the income, rents and profits in any manner arising out of the real estate of which the said Harriet D. Cruger was seized or possessed or of which the said George Douglas and William Douglas, as such trustees as aforesaid or otherwise were seised or possessed for the use and in the right of the said Harriet D. Cruger.

That there were in the possession of his said wife various letters written by her to him at sundry times; and also many other papers and documents, which were delivered to him and which were afterwards loaned to her, under the express promise by her that the same should be returned. That there were also in the possession of the complainant's

wife many other letters, papers and documents which were or might become material to the matters in controversy. That he could not particularly enumerate the said letters: but that, among the said papers and documents, were the two wills made by her, the one on July, 24th, 1833, and the other on February 14th, 1834; the note, order or memorandum in writing delivered to James Monroe, as aforesaid, on 26th October; and the deed of appointment bearing date November 2d, 1839; the opinion given by George W. Strong, Esq., with the note or remarks endorsed thereon by the complainant's said wife bearing date January 29th, 1841; the letter of William Bard, Esq. to Captain John Whetten dated November 27th, 1836: all of which the complainant submitted should be produced or accounted for and such of them as were his property restored. And that he had also frequently and in a friendly manner applied to the said George Douglas and William Douglas to render an account of all the estate, real and personal, whereof they had charge, as such trustees as aforesaid, and of the rents, profits and income thereof; and to pay him over such portion thereof and let him into the enjoyment of such parts as by the deed of appointment thereinbefore last recited he was entitled to, being the one-half or moiety thereof.

*Prayer :* That an account be decreed to be taken of the said trust estate; and of what the same was now composed. And that an account might also be decreed to be taken of the personal estate; and that, whatever balance should be found due, might be decreed to be paid to the said complainant.

And that the said post-nuptial settlement be decreed to be void and insufficient to bar the rights of the complainant to the free and entire possession, control and enjoyment of all the personal property belonging to the said Harriet D. Cruger, as well such personal property as was owned by her, at the time of her said marriage, as aforesaid, as all other personal property since acquired by her, by increase or otherwise, whether standing in her name or in the names of her trustees, for her use and benefit, or in the name of any other person whatsoever, for her use and subject to her control. And that, if the court should deem said post-nuptial settlement to be good in part and void in part, then that this court

might decree that said settlement be thenceforth null in such parts as to the court the same should seem invalid and objectionable ; and that he be restored to all his rights, as the husband of said Harriet D. Cruger, in all such portions of the property of said Harriet D. Cruger as were not affected or controlled by said settlement.

And that the said George Douglas and William Douglas, acting as trustees under the said settlement, be enjoined from further interfering with said property and be decreed to account.

And that the said George Douglas and William Douglas let the complainant into the possession and enjoyment of the real estate belonging to the said Harriet D. Cruger.

And that the trustees of the estate might also be enjoined and restrained from proceeding, in any way, to collect the debts contracted to the said estate, as hereinbefore stated, by the complainant's relatives or by himself on their account. And that the said trustees be decreed to assign the said bonds and mortgages to him in due form.

That in case the said trustees, in the opinion of the court, should have full power and authority, under the post-nuptial settlement as aforesaid, to act as such trustees, that they be directed and required forthwith to proceed to demand and recover from the said George Douglas the property in his hands belonging to the complainant's wife—and that they collect in the same with all due diligence and invest it ; and that they be decreed to convert all of the principal into productive property and to manage the same so as to yield the most income ; and pay whatever arrearages of the income of the said estate might be outstanding. And that a receiver be appointed. And that the said George Douglas and William Douglas might be enjoined from collecting, &c. And that the said George Douglas and William Douglas might be removed from being trustees, under the said marriage settlement. And for further relief.

The defendants, Mrs. Cruger and George and William Douglas put in a joint and several answer. It admitted the marriage.

The defendant, Harriet D. Cruger, denied that the complainant, on his said marriage, became entitled to or was in-

1844.

CRUGER
v.
DOUGLAS.

vested with the personal estate or the income of her real estate for life or during the said marriage.

The said defendant, Harriet D. Cruger, further answering said, that previously to her acquaintance with the complainant and in obedience to the opinions of her parents, now deceased, she formed a resolution to keep secured, in any event, to her own use, during her life, the income of her whole estate; and to transmit the principal thereof unimpaired to her next of kin and heirs at law; and never, freely or willingly, departed therefrom in any particular. That prior to any offer of marriage the said complainant and this defendant had conversed concerning the practice of settling the fortunes of married women to their own separate use; and, in such conversations, the complainant expressed great aversion to such practice and asserted that the husband ought always to possess an absolute control over the wife's property. That the said complainant, in the year 1823, made to the defendant a proposal of marriage, which she, for the time, declined; and assigned, as one reason, his opinions in relation to the settlement of the fortunes of married women. That in the year 1826, the said complainant made another proposal of marriage; and in making such proposal, amongst other things, addressed to this defendant, in writing, the following language: "Nor do I know or have I ever inquired what property you may be possessed of or how it is situated; and I should be most reluctant to forego my present independence, with no other expectation than to exchange it for a dependence upon that property, be it much or little; which, though I might wish it to be placed beyond the reach of misfortune, I could not brook to be beyond the pale of my control; since I should deem myself competent to its charge, if esteemed by others worthy to be entrusted with your person and your happiness." And this defendant finding, by the terms of such last mentioned proposition, that the complainant's said opinions were unchanged, she returned an unequivocal rejection. That within a very short time after such last mentioned proposal, she departed on a visit to Europe. That whilst she was absent in Europe, the said complainant visited her in Scotland, England and France. And that, on those occasions, he renewed his said proposals

of marriage. That this defendant steadily adhered to her said resolutions—and, in the most express and distinct language, announced her fixed determination never to contract matrimony with the said complainant, unless on the condition of her whole estate being duly settled to her own use in such manner as to exclude a husband from acquiring any right over any part thereof or any of the income thereof. That at the city of London, upon an evening in the month of November, 1829, the complainant did, whilst in company with this defendant and several other persons, privately place in the hand of this defendant a small piece of paper, on which was endorsed in pencil writing, " I live for your happiness :" and within which was written, in pencil, the following words, " The property to be conveyed to trustees. The income for the joint use of the parties and of the survivor. The principal for their children ; the eldest son to bear the surname of Douglas."

That the said pencil writing produced a renewal of discussion, whereupon this defendant expressed to the said complainant her entire dissent from the kind of settlement, in case of a marriage between him and this defendant, suggested in said pencil writing.

That such discussions were from time to time still continued, until the said complainant, in London, in or about June, 1839, expressly relinquished his said objection to a settlement of this defendant's estate and income to her separate use ; and agreed that that point should be deemed settled and at rest and that, in case this defendant would marry him, all the property of this defendant, real and personal, and all income thereof, should be vested in trustees, in such manner as the laws of the state of New York required and permitted and as counsel should reasonably advise for securing the whole principal and income to the separate use of this defendant, during such expected coverture, free from any control or interference of the said complainant and excluding him from acquiring any right, title or interest in any part thereof or of the income ; and that she should be vested, notwithstanding such coverture, with the fullest powers of control and disposition. That, at the time of making such agreement, he observed that his sole objection to such settle-

1844.

CRUGER
v.
DOUGLAS.

ment was his repugnance to admit himself to be unworthy of confidence; that if the settlement to be executed should be executed before marriage, it would be published to all who might see it on record; that full confidence had not been reposed in him; and he, the said complainant, therefore, requested this defendant to consent that the formal instrument required to make such settlement effectual might be executed after and not prior to such marriage. And she acquiesced in such request—stating, at the same time, that although she was willing that the said settlement should he made in the manner most agreeable to his feelings, yet, she would expect it to be made in a proper, legal and binding way.

That, in several conversations subsequently and prior to the said marriage, the same agreement was, in general terms, recognized by him as the basis of his suit for the hand of this defendant. And the same continued to be in full force at the time of such marriage; and had never since been cancelled or rescinded. That the said complainant obtained the consent of this defendant to the marriage on the express condition that such agreement should be observed and performed by him. And she assented to the marriage in full reliance on such agreement and in performance thereof on her part. That almost immediately after the marriage ceremony had been performed, Mr. Robert Halliday, now deceased, announced to this defendant that the said complainant was about to execute a settlement of her property to her separate use—and invited tnis defendant into the next room to hear it read. And immediately thereafter the said complainant read over to this defendant the said deed of marriage settlement, bearing date June 29th, 1833, in the said bill of complaint set forth and delivered the same to one of the said trustees then present. That she was not surprised at the making of such deed of marriage settlement, as in said bill untruly suggested; although she was somewhat surprised at the time and place selected for the making thereof. She denied that she did, on that day or evening, verbally or otherwise, give to the said complainant the entire income of her estate for life or any part of such income or anything else whatever; or specially or otherwise call two of the said trustees or any person or persons whomsoever to witness

any such gift, or any gift whatever, from this defendant to the said complainant. And she wholly and absolutely denied the allegation in said bill contained touching the gift therein alleged to have been made by her to the said complainant in return for such settlement deed. But she said that after the said deed was executed, she, then and there, did request the said Robert Halliday, James Monroe and other persons then present, to bear witness to her declaration that if she should die that night or before having an opportunity to make a will, it was her will that the said complainant should enjoy the income of her property during his life. And that she did not, on that evening, make or intend to make any gift or disposition in favor of the said complainant, other than a verbal or nuncupative last will, to take effect at her death in case he should survive her; and she then and long before well knew that wills were revocable; and that she used that revocable form of disposition in conformity with her said long previously conceived determination not to give to her husband any right or title to her property as long as she lived.

And this defendant denied that the said complainant named the said George and William Douglas as trustees out of compliment or otherwise—for she herself named her said brothers to the said complainant to be such trustees.

That the said order on Robert Halliday dated "Bloomingdale, 15th July, 1833," was signed under the following circumstances, that is to say: the said complainant stated to this defendant that there was some inconvenience in the then existing state of things; for that this defendant, being a married woman, could not give a check for money and that he, having made a settlement on this defendant, could not give one. This defendant inquired how this inconvenience could be obviated and the said complainant suggested that this defendant should give him an order on her said trustees named in said marriage settlement, to the end that he might receive the income of her estate and pay it out as might be required. That it was her desire that her husband should have the disbursement of her income, but subject to her said separate rights; and, therefore, she at once acquiesced and proceeded to draw an order accordingly;

but not understanding precisely how to frame the same, her said husband came to her aid and wrote the said order down to and including the word "receipt," in duplicate, one for himself to keep and one to be left with the said Robert Halliday; whereupon this defendant added the subsequent words and subscribed it.

She denied that the said order was an irrevocable order or appointment or that the same was in fulfilment or confirmation of an alleged gift; on the contrary that the same order was applied for and given merely as a temporary direction to the said Robert Halliday, as the agent and acting trustee and for the purpose of supplying her said husband with means of disbursing the income as received in such manner as the uses of this defendant might require: she intending to conform herself, as far as reasonably possible, in all things, to the pleasure of her said husband. But she did not intend; nor did her said husband, when obtaining the same order, intimate in any way that the same was or should be irrevocable. And if it was so irrevocable in strictness of law and was intended to be relied on as such by her said husband at that time, then she, this defendant, said that her said husband, in obtaining the same, took an unfair and undue advantage of her ignorance and confidence in him; and that the same order was therefore fraudulent and void.

That, under the impulse of affection and in pursuance of her good intentions but not under any sense of obligation nor believing or supposing that any will or appointment in the nature of a will which she might make would be irrevocable, she, shortly after the giving of such order, requested the complainant to write a will for her; and he accordingly drew a will to the purport stated in the said bill and bearing date July 24th, 1833, which this defendant duly executed and delivered it to the said complainant for safe keeping. And she admitted that the said order on the said Robert Halliday and the said last will were left in the hands of this defendant, by the said complainant, on his departure for Scotland. That the said complainant did, during his said absence, write a letter, bearing date at Edinburgh in Scotland, September 29th, 1834. That the following extracts therefrom contain, according to the best judgment of

1844.

CRUGER
v.
DOUGLAS.

this defendant, the nearest approach to the sense imputed to said letter in the said bill of complaint, to wit: "My mind will never be perfectly at ease until assured, beyond the reach of all casualities, that at no ·period of my existence, upon no contingency, however remote or improbable, shall I become indebted, without the power of requital, to others, for the means of a gentlemanly subsistence." Again, " It is time now that I should choose a settled mode of life, neither my temper or my convictions, my pride or my confirmed habits will allow of this being left to chance or the government of circumstances—nor will they admit of any plan of which idleness, frivolity or insignificance are to be the characteristics.   On my return home, measures must be definitely taken for me to commence the career of a professional man, a public character or a private citizen.   The decision must be upon full deliberation.   Deeply concerned, you are called to the counsel ;—be it my part to lay before you, in fitting, business-like though perhaps chilling manner, all the circumstances that need be weighed to strike the balance ; and yours to con them over hourly from this moment until your hand is again in mine to help me on in the path you choose.

" Consistently with that longing after independence I have related, my situation admits of but one pursuit—that of the law.   If this is to be my course, the first step on my return, should be the removal of my office to the business part of the city ; and then my mode of life would be thus : To breakfast at eight, and be at my desk at nine punctually—and as the clock struck three, start for home, the dinner being served while on my way.   Returning at four, my stay in the afternoon would be until dark always, and frequently until ten at night.   I should decline all invitations, make no visits, and resort to no place of public amusement : but be indeed what I professed to be, a man of business.   The great competition in New York, my newness there, and indeed my marriage itself would all impose this assiduity and self-denial upon me.   It is not a life of pleasure or perhaps of happiness, and has little to invite but stern principles.   I, however, have done it—and although now surrounded with temptations, especially of your society, greater than formerly,

1844.

CRUGER
v.
DOUGLAS.

" I trust that my resolution to do that which is right would not fail me. The reward would not be distinction at the bar, for princes are not the competitors : but it would enable me, in the course of about ten years, besides supporting myself and helping others, to acquire property enough to insure an income of twelve hundred dollars a year, and that would place me beyond all chance of ever standing in need of foreign aid." Again,

" Before leaving New York, I placed in your hands three papers, with a request that you would look them over. The first was the order upon your trustee to pay to me the income of your estate as it accrued. The purpose of returning you this, was, that you might, if you choose, revoke the stewardship. It was accompanied with one requisition which made it irksome—that of a minute accounting for all expenditures. Of the policy even of such reckoning, I have ever had my doubts. In one's own case, besides the incessant loss of time, trouble and perplexity it occasions, I know of no motive for it, except that we doubt our own good purposes in spending and so keep up this frail check ; with regard to others, it directly conveys the imputation that they may misapply our money. For the purposes of real economy, it is enough that we previously determine upon the amount of our annual disbursements, whether it be the limit of our income or any thing short of it—and then, by memoranda of large payments, and a periodical general computation of current expenses, see that we keep within it. But to worry for an hour over confused pencil marks or petty accounts, for the price of a turnip or a piece of tape, is decidedly bad economy ; for, the same time applied to earning money would answer ten times as well—and the worst of the practice is, that it becomes a superstition and an inveterate habit. It was melancholy to see the piles of account books my poor father left, containing the most scrupulously minute entries of daily expenses, his princely estates ' running to ruin the while.' You proposed, at one time, to give me the whole of your share of your sister Margaret's estate,—then the income of it—and latterly, four-fifths of the income, to be disposed of by me, without accounting for it to you. This implies that for the rest of your income, rigid and detailed accounts

1844.

CRUGER
v.
DOUGLAS.

" are to be rendered ; and further, that there may be uses of the money I might wish to conceal from you. There are none such : Heaven forfend there ever should be. I have no vicious tastes to gratify, and no sinister purposes to subserve. Neither of my own, nor of your money, shall I ever wish to spend any, without your knowledge and approbation. Take away this poignard of ice from between us—it is brittle, but it is cold. It portends that you and I are not one, and curdles the confidence that should flow to and fro. I desire no interests separate from yours, for I love you, and we are married. Although accounting in detail be irksome and humiliating, yet, I wish for the use of no part of your property that shall be unknown, and so the fruitful source of suspicion to yourself." Again : " The last of these important papers was your will : as far as delicacy would permit, I had before intimated to you my wish to have it executed anew. You will remember it was but a rough draft, intended to be engrossed in your own hand writing, which I had prepared at your instance. My reason for wishing it altered was, that the manuscript was mine. The credit of the act I desired to be wholly yours : whereas, remaining in my hand-writing, it would bear the appearance of importunity or dictation on my part—both of which, I aver, are foreign to my nature. That the instrument was defectively executed, was a suggestion of Mr. Halliday's, of his own accord. When appealed to, I confirmed his objection. You declared you would make a new one, or if you did not, that your brothers and sister would never dispute it, that would depend not upon them, but upon the decision of the law, and the duty of executors ; or even were they to assent, I should not, perhaps, be willing to receive from their forbearance what I might be willing to accept from your affection. Under any circumstances, a will is the most unstable of all things ; a new one may be made every day or every hour in one's life ; but when we superadd doubts of its validity, its provisions are the last dependencies we should ever look forward to. When we meet again, tell me directly that yours is destroyed and I shall be better satisfied than under a knowledge that it subsists as my autograph or your imperfect design ; and I will take my measures for life accordingly.

" Reflect well and dispassionately on all I have said, and when your mind is maturely made up, do whatever you conclude, ere I get back, perfectly, completely, and may the God of Heaven vouchsafe to your acts all the happy results desired by a love such as that of your

"HUSBAND AND FRIEND."

He, the said complainant, in the said letter, also, uses the following language, to wit : " My repugnance was alone to sign any document proclaiming to the world a doubt of my honest affection before marriage or of my honorable conduct afterwards. Little, however, did I expect this instrument to be singled out for suspicion. I know it to be all-sufficient and done in the best faith ; but now, in addition to the explanations heretofore given, I can do no more than tender the inclosed means of dispelling all doubt."

That within the said letter of September 29th, 1834, there was enclosed a letter in the proper hand-writing of the said complainant, in the words and figures following, to wit :

" EDINBURGH, 29th Sept., 1834.— To Robert Halliday, Esq. Dear Sir : Understanding that doubts have been entertained as to the comprehensiveness of the post-nuptial settlement I executed of Mrs. Cruger's property, I conceive it to be your duty, as it certainly is my desire, that another be drawn out with every formality of the law, to quiet all misgivings, so that I may execute it immediately on landing again in New York. Very sincerely, yours, &c.

" H. N. CRUGER, Jr."

That the said complainant, whilst thus absent, also sent to this defendant a paper purporting to be a journal of reflections and events occurring at sea on his voyage to Europe, in his own hand-writing, in the form of a letter to this defendant : in which, under the date of May 14th, in the year last aforesaid, the said complainant, referring to the said deed of settlement, used the following language :

" And now to extract a thorn in my side. You have asked me often to speak out and not be calm and silent : and if the thoughts do come, it perhaps is best you should know them. As I shall never ask for that confidence which your generosity might bestow or my character entitle me

1844.

CRUGER
v.
DOUGLAS.

" to or which may be due to the identity of interests and intimate relation existing between us, so I shall ever feel keenly sensitive to anything that has a contrary look. Perhaps the explanation I gave you a day or two before coming away, as to the words you pointed out in the settlement of your property, as it was brief and hasty, may not have proved entirely conclusive and satisfactory. The words were, ' so that she may enjoy and dispose of the same, as it came from her parents and sister or may hereafter in any manner accrue to her ;' and the doubt was, whether the specification of ' parents and sister' might not restrain the generality of the other words, so as to exclude any other property heretofore acquired in a different manner—as, for instance, from your uncle. Of course, the question could not embrace anything hereafter to accrue, for the terms expressly include such acquisition, made " in any manner." Then as to the property you have hitherto received from your uncle, being the only property you have received, seemingly, from any other source than your ' parents and sister.' In legal construction, you have derived even this from your parents, for it came to you in right of your father and through him solely by the terms of your uncle's trust settlement. But again, the rule of construing a legal instrument is that all the parts are to be taken together to determine the meaning of the maker and not an isolated sentence. Now, in the beginning of the paper, I had ' freely, fully and unreservedly restored to you all the estate theretofore owned by you or which you might thereafter acquire ;' and such language, I conceive, conveys, most strongly, what certainly was my intention, a total abdication of all interest or right in your property, in possession or expectancy whencesoever derived or howsoever situated. And I can only add, that 1 shall be prompt, at any time and in any manner, upon the slightest suggestion, to make your property, if possible, more secure for ' heirs you know not whom,' or for those who are already sure of a pernicious superabundance ; trusting, as of course, they must be nearer and dearer to you than I am, so also that they will make a better use of it (which alone makes it worth preserving,)

" than I should—at least as good a use as George is making of his."

And this defendant, further answering, said, that she did address to the said complainant a letter, dated July 16, 1834, in reply to the said Journal at sea; and which was her first letter after he left said order and will in her possession. And she admitted that she did in such letter use the words " the interest of all my property you shall have as long as you live," as mentioned in the said bill; but she said that the true intent and meaning of these words were, by the other matters in said letter, fully explained and shown to be, that he by living with her, would actually enjoy the said income, although he would have no legal or equitable ownership thereof. That, among other things, the last mentioned letter contained the following matter : " I came to the part you call taking a thorn from your side. And I read the feeling that had been rankling in your breast since I spoke to you of a sentence in the marriage settlement : and I read on without pain or misunderstanding of what you wished me to do, your fuller explanation of that sentence and declaration of being ready at any time and in any manner to make my property, if possible, more secure; but why did you end this last thus : ' for heirs you know not whom,' or ' for those who are already sure of a pernicious superabundance trusting, as of course, they must be nearer and dearer to you than I am, so also, that they will make a better use of it than I should or, at least, as good a use as George is making of his.' Oh ! how this and what followed changed the spirit of my dream." Again—' Mr. Halliday was the author of the doubt on that sentence, though he forbid me to mention his name : but I thought I had done so. I have no suspicions of you ; no want of confidence, so help me Heaven. . My marriage settlement was such as I had *always* resolved it should be, a security of the abstract rights my parents had left me : which I think I have no right to alienate or you to wish me to do than taking the eyes out of my head and give them to you literally, because I had committed my person to you."

That such last mentioned letter was extorted from her,

by the indications of dissatisfaction on the part of the said complainant referred to in such letter and by a consequent apprehension that his affections were becoming alienated from her. She, therefore, insisted that her said letter could not be justly regarded as a free and voluntary gift of the income or of any part thereof. That the said complainant returned to New York, December 6th, 1834 and having, on his own request, received the said order from this defendant, proceeded as before in the receipt and disbursement of the income of this defendant's property. That afterwards and on February 14th, 1835, she, at the special instance and request of the said complainant, copied her said will of July, 1833, except as to the date and executed the same copy in due form of law, as her last will and testament, in the presence of three attesting witnesses. She denied that the said wills were or that either of them was executed in pursuance of any agreement. That the first and the latter were the expression of this defendant's will and pleasure that in case her said husband should survive her, this defendant, he should, from and after her death, enjoy the income of her said property, so far at least as any will which she could execute was adequate to give him that right. And this is her present will; and she has no present intention of ever revoking the same. That in the year 1835, shortly prior to and in anticipation of the usual annual settlement of her estate, on the twenty-ninth day of June, that being the anniversary of her birth and marriage, the said Robert Halliday, as acting trustee of her said estate, announced that the sums drawn from him by the said complainant, had exceeded the income of this defendant's said estate and enroached on the capital many thousand of dollars; that, thereupon, the said complainant entered upon the examination of the accounts of said estate and so stated the same as to reduce the said excess to $2,785 22. And this defendant admitted that the said complainant, on that occasion, did pay to the said trustees such last mentioned sum of money and also $1,080 60, being for principal and interest of money lent by her said trustees on bond and mortgage without her knowledge and consent, but by direction of said complainant to Henry N. Cruger, the uncle of the said

1844.

CRUGER
v.
DOUGLAS.

complainant: all of which was done to make good the capital of her said estate. And, also, admitted that the said complainant repaid to William Douglas $1,000, theretofore borrowed by the said complainant. But she denied that the $1,000 borrowed from the said William Douglas or any part thereof was applied for the purchase cf horses for her use although she admitted that she had some use of the horses which were purchased therewith, by the complainant. And this defendant had no reason to believe, did not believe and, therefore, denied that the said payments by the said complainant or any of them or any part thereof were or was made by the said complainant in consideration of or on the faith of his having the whole income of her estate for life or any part of such income. That during the time that such adjustment of accounts was progressing, the said complainant evinced great dissatisfaction at being thus obliged, as he considered it, to state minute and particular accounts of the moneys disbursed by him and made this defendant very unhappy by his conduct, absenting himself from her society and complaining of the labor so imposed on him and of this defendant's want of confidence. That he, again, during such absences, presented to this defendant a view of the sufferings which would result to her from his applying himself to business; that among other intimations to that effect, he, said complainant, on the nineteenth day of June, in the year last aforesaid, addressed to this defendant, at Staten Island, (Richmond County,) where she was then residing, a letter containing the following matter: "You know my reasons for not coming to Staten Island— and if this much is irksome to you, how would you bear the pre-occupation and absence of a regular man of business? Whatever you wish me to be—whatever may conduce most to your happiness—choose for yourself and you have the proud satisfaction of knowing that want of capacity on my part does not prevent; but when your choice is made, let there be no half way measures and no repinings, for they would be unworthy on each side." And whilst such accounts were being examined, the said complainant urged this defendant to write a letter to the said trustees other than said Halliday, inquiring of them whether they

had accepted their said appointment and, in that event, requiring them to take an active part in the management of her said estate, in order to preserve it from injury ; and, on her declining so to do, the said complainant himself addressed to them a letter, dated the second day of May in the year last aforesaid, containing the latter request and, also, the following matter : " Doubts having been entertained of the sufficiency of the post-nuptial settlement, drawn up by me, the first subject for your consideration will be the expediency of having another prepared and I shall be ready to execute it in whatever terms it may be couched."

That the said complainant, for the purpose, as she believes and charges, of vexing and annoying her and thereby forcing her to settle upon him her income or some part thereof, did, on the thirteenth day of June in the year last aforesaid, send to this defendant and her sister, Mrs. James Munroe, some business letters which had been received from Europe and a letter from himself, in the following words:

NEW YORK, 13 June, '35.

*To Mrs. Cruger and Mrs. Munroe :*

" I wish you, dear ladies, to take the accompanying letters into consideration, in connection with those previously received, in order to determine whether your family should send an agent out to Edinbro' to represent them, on the approaching final settlement of your uncle's estate.

" Should you determine affirmatively, I shall be glad to be preferred to the office.

" My object in going would be to earn for myself a little money ; for I desire to be out of debt, and should like before I die, to enjoy the feeling of absolute independence and gratify the natural craving of the human breast to be the possessor of some property.

" This being the motive, of course there would be an impropriety in my expressing an opinion as to the expediency of your employing an agent, and I must refer it to your family councils exclusively. You will, I trust, pardon my suggestion however, that a decision should be soon made.

" The suffering I shall have to undergo, and the sacrifices I must make, are but a part of the condition of a poor man ;

1844.

CRUGER
*v.*
DOUGLAS.

" and I beg of you to regard it but in one point of view—a a means of bettering me in pecuniary circumstances.

"Your friend indeed,

H. D. CRUGER."

That about the same time, this defendant received from the hands of the said complainant, or in an envelope, the said order for her income. That, although as yet fully determined not to give to said complainant the legal right to her income, she was very willing to render the manner of its receipt and disbursement agreeable to him : and, therefore, and for no other cause and not with any view to confirm any former order or make an irrevocable appointment in respect to her said income, she gave to the said complainant the paper dated June 29th, 1835, in the said bill mentioned. But the said paper was given whilst she was in great distress of mind from the said annoyances and his manifestations of anger and discontent; and that the same was in fact extorted from her by the said complainant, by means of his murmurings, neglects and unkindnesses ; and that the only difference which the same paper was understood to make or did make, in respect to the receipt of the said income by the said complainant, was to relieve him from the necessity of keeping minute accounts and to permit him to spend, without regard to this defendant's wishes, a portion of the income from her sister Margaret's estate and to allow a general method of accounting to this defendant when she should see fit to require accounts.

That she did not recall her said order from her said trustees without notice to the complainant, but in July, 1836, she withdrew the agency of her estate from Halliday and appointed Francis Brown as agent ; and upon the same occasion she also withdrew from the hands of the said Halliday his duplicate of the said order. That she did not give the complainant any prior notice of such change; but she did notify him thereof and of the causes thereof immediately after such change was made by a letter bearing date July 27th, 1836 : being the same letter of that date incorrectly stated to have been written in the course of a long correspondence on that subject. That the said complainant, on receiving such notice from this defendant, became greatly ex-

cited and addressed to this defendant a letter, in the following words: "29th July, 1836. Instead of yourself, my dear Harriet, to welcome me last evening, as I had eagerly expected, I found your letter of the day before, which has well nigh turned me out of your house. God in his mercy forgive you for the agony and humiliation it is inflicting on me, whose bosom was fraught with the kindliest thoughts and purposes toward you. Not for three times your whole fortune, dedicated to the best and wisest uses, would I have made even a stranger suffer so much as I am now undergoing. Until Monday morning I will wait for you either to confirm or recall that letter: and, in the meantime, shall neither act or decide upon its contents. But merely for your own sake, solemnly urge you to consider well for *what* it is you are on the brink of sacrificing your own respectability and happiness and that of your unoffending and still devotedly attached husband,        HENRY D. CRUGER."

That the said complainant, on the said Monday, left the house of this defendant and went to board with a Mrs. Forest, in the upper part of the city—and gave this defendant notice that he had done so because she would not revoke her said determination to economise in her expenditures; incorrectly alleging that it was a measure of self-respect and an effectual compliance with this defendant's wishes. And the said complainant not only invited this defendant to go and reside with him, at his said lodgings, but insisted that she was bound so to do. That the said complainant, whilst so boarding at said Mrs. Forest's, stated that he was about resuming the practice of the law; and was constantly addressing to this defendant letters relative to her property. That being much distressed, she requested William Bard, Esq., to call on the said complainant and explain to him the unreasonableness of his said conduct— and endeavored to persuade him to return to his home. That upon that occasion the said complainant addressed a letter on the subject to the said James Munroe, then one of her trustees, urging the necessity of having his said accounts of the disbursement of this defendant's income settled and approved, and concluding this—" With my accounts settled, then the order to her trustees made unchangeable and with-

" out accountability, and the appointment of myself as her agent, I believe we can again be united and permanently happy. Until the first requisite is complied with, we must remain apart; and without the other two, I can but say she is welcome to a full share of all I can earn by my industry." That she refused to yield to his requisitions, except as to settling accounts; upon which the said complainant addressed her a letter in the following words:

SUNDAY NIGHT, 7 Aug. '35.

" *My Dear Harriet:*—My uncle informed me last evening, with deep distress, that his mediation had been in vain, as you refused to do anything unless I ' would return to you and trust to your confidence and affection.' He also expressed the opinion that our friends could be of no use or anything be accomplished unless we came together in a spirit of mutual concession.

" 'Through the long hours of a sleepless night and of this sacred day I have communed with my inmost soul under the teachings of religion and affection, and am now resolved to do my utmost to remedy this horrid state of things.

" I will meet you on your own terms. I will confide in the affection, honor and generosity of my wife—and God grant, for her own sake, that she may justify that confidence. Whatever you mean to do, let me beseech you to do it the instant we are re-united, that the whole matter may be once and forever folded down and the past consigned to oblivion. We will, then, if agreeable to you, immediately leave town for Henderson, after giving directions to Mrs. Peckwell what furniture is to be packed up for the country; and I devotedly hope and pray that this may be the auspicious exodus of a mutual happiness, never to be disturbed again during life.

" In all truth and sincerity,

" Your devoted husband,

HENRY D. CRUGER."

That the said complainant returned from Mrs. Forest's to the house number 55 in Broadway, on or about the eighth day of August in the year last aforesaid. And, on such return, the said complainant produced a formal document, ready for this defendant's signature, which was intended to

settle some part of her property irrevocably on him—and
required that this defendant should execute the same. That
she positvely refused to sign or execute the said document;
and, after some discussion, finding that this defendant could
not be induced to recede from such refsual, the said com-
plianant stated that he would stand on his rights and that the
order which he already had—meaning the said order of July,
1833—was irrevocable; which this defendant supposed to
be a true statement. And, thereupon, taking from its place
of deposit the said duplicate of such order, which she had
so withdrawn from the said Halliday, she handed it to
the said Halliday; saying to him, in the presence of the
complainant and the said James Monroe, as nearly as this
defendant can now remember her words: "There Mr. Hal-
liday, pay the whole income to Mr. Cruger. I will sooner
beg my bread from door to door, than touch a dollar of it."

That, on the same day, after the said Messieurs Monroe
and Halliday had left said house, and no other person being
present, under the influence of the same feeling, she ad-
dressed to the said complainant, as nearly as she can recol-
lect, the following words:—"Mr. Cruger, no person knows
how that order was written but you and myself. If you
wrote it irrevocable, when you knew I intended it to be re-
vocable, how do you stand? I beg of you to retrace your
steps." That the complainant appeared confounded by this
appeal, answered confusedly that he was willing to do any
thing to rectify any error into which he might have drawn
this defendant and that he would rectify it. And on the
same day, he wrote and delivered to the said trustee the fol-
lowing declaration:

NEW YORK, 8th August, 1836.

" To Robert Halliday and James Monroe, Esquires,
          " Acting Trustees of Mrs. H. D. Cruger:

" Gentlemen:—Under Mrs. Cruger's assurance that she
did not intend the order for the payment of the income to
me to be irrevocable, I, of course, have not the right to have
it so considered, which I asserted before receiving that as-
surance.          Respectfully yours, &c.
"H. D. CRUGER.

That on the fifteenth day of the same month, just before going up to their country residence, he left for this defendant, at her brother's residence on Long Island, where she was then staying, a paper containing only these words : " I leave our happiness in your hands.   August 15, 1836."

That the said complainant, about the last mentioned date, went to their country residence at Henderson, in the county of Herkimer, and early in September next following returned and rejoined this defendant at the said house in Broadway, for the purpose of making arrangements to furnish and prepare for occupation the new dwelling house of this defendant at Henderson aforesaid, then just completed ; that, at this time, the said complainant was for some days excessively moody and sullen and evinced his discontent at the condition of this defendant's property in various very offensive ways.   That he would refuse to take wine at table, saying that he did not own it ; would refuse to ride, saying that he did not own any carriage ; and constantly complained of the aforesaid alleged revocation of said order by taking it from the said Halliday.   That on or about the 17th of September, in the year last aforesaid, she remonstrated with the said complainant about his conduct—assured him that she did not intend to revoke said order, by taking it from the said Robert Halliday, but only to  prevent a waste of the principal of her estate and, by proper economy, to repair the injuries which it had suffered.   Whereupon, the said complainant produced the said order and wished this defendant to write thereon the words " restored and confirmed."   But she refused to reinstate it ; and thereupon the said complainant wrote upon and beneath the same, with his own hand, these words : "Revocable 17th September 1836. HENRY D. CRUGER."   That he spent part of the autumn with this defendant at their said country residence ; and after their return to their said house in Broadway, in the month of November in that year, he renewed his murmurings about his dependent condition and urged this defendant to unite in three certain papers which he then produced, in his own hand writing : being an authority from her to her trustees to allow her husband to receive the income for life ; a power from her and the trustees to that effect ; and a

1844.

CRUGER
v.
DOUGLAS.

bond from him to pay over to the extent of one half of the income to her. That in order to avoid his importunities, she left her house in November, in the year last aforesaid, and went to reside with her friend, Mrs. John Whetten, with whom she remained until about the fourth day of December following. She denied that she and the said complainant referred all matters or any matters in difference to Messieurs Bard and Whetten. But she did, during her residence with Mrs. Whetten, request the said John Whetten, as her friend, to consult with said Mr. Bard, the friend of the said complainant, for that purpose appointed on his part, as to the best method of pacifying the said complainant and terminating his interruptions of her domestic peace. That no award or decision was made nor did they unite or concur in any opinion, but, on the contrary, each of them put in writing his own opinion. That the letter from Mr. Bard to Mr. Whetton in the said bill set forth and bearing date November 27th 1836, contained the opinion of Mr. Bard only; and that she, on being shown the same, did forthwith absolutely refuse to comply with or act upon the advice contained in such letter. That the said complainant did not acquiesce therein; and, on the contrary, did, on the twenty-ninth day of November in the year last aforesaid, object to the said opinion of Mr. Bard in writing. That the opinion of Mr. Whetten was exhibited to the complainant; and he positively refused to accede to the same and again proposed that this defendant should unite in the said three papers. That she sent to her sister, Mrs. Elizabeth Mary Monroe, the paper under date of the thirteenth day of November one thousand eight hundred and thirty-six as in the bill stated; and she denied that the said complainant accepted or acquiesced in any such paper. But in order to pacify said complainant and restore harmony, so that she could return to her home, she did address to her said sister a letter; and that the following is a copy of the same and of the certificates of the said John Whetten and of this defendant's said sister thereto annexed:

"*Snug Harbor, November* 30, 1836.

DEAR SISTER :—The first restless night I have had since

"I have been here was the last, which proceeded from the painful feelings your note awakened—not received till Mrs. Barber returned in the last boat. You said nothing cross—but I sunk under the conviction that I should go out of this world without even my own and only understanding me.

Show the Purity and Portia to Mr. C.; he will and should understand them, as he both put the whole play in my hand when I was going to the farm for you, with a request that I would read it—but, on the resolutions steadied by their illustrious examples, I mean to act.

They were not altogether irrelevant for you, my sister and collateral heir, as you will see when I give you a "clear view," not only of my wishes and feelings, but my resolutions—under the determination I have to make the world understand me that I do not act for money either to spend myself or save for you.

Know then that, though the offer has been twice rejected by Mr. Cruger, I now assign to him—willy nilly—all the evidences I hold, not only of the advances made to Messrs. N. and L. Cruger, but those to himself, his sister, his brother-in-law, his uncle and his uncle in-law. Which, on reference to Mr. Halliday, I believe you will find is getting over $40,000.

The most of this, my dear sister, is out of the principal of my estate : but you, (the only one of my three heirs who know my circumstances,) have urged me to do it. Of myself, I never would have signed away or even compromised the collateral birthright—you, George and William have—and when the post-nuptial settlement was made, I thought I had secured them.

I also mean to relinquish my plan of reserving a per centage of my income to gradually restore the sums taken from my principal ; which would (had I lived long enough) again have given you the unimpaired whole I had received by my birthright.

Thus Mr. Cruger remains in the full possession of my whole income, lessened only by the non-payment of interest by some of those of his family to whom he has made loans.

I never will sign any other papers than those that are signed, my will and my revocable order. But I have said

to Mr. Whetten and will say to all those who desire the respect : " When you see me revoke that order, (let Mr. C. act as he will,) you may give me up, for I will then be given up of God."

Now, as to my will, a dark thought came over me that I would destroy it ; but it was a thought of vengeance and the great lawgiver has said " Vengeance is mine." So now, I here solemnly say, that (also let Mr. C. act as he may,) it shall never be touched.

The light that a word in the last sentence throws on the state of my feelings leads very naturally to my telling you and him that had Mr. Whetten come over with the paper he drew for me, signed " With all the heart of Henry Cruger," there was still a great deal on the score of feeling to be settled *sine qua non,* between him and I, before he would again lie by Portia's side and she have a quiet soul.

Don't let Mr. C. here make the mistake that you did, that I am going from business because I have got a fine idea in this last sentence.

Mr. C., in signing the settlement, has signed the only paper in my favor I ever will receive from him. That secures your rights, in which are wrapped up my duty to my deceased parents.

And now to this solemn paper I put my name.

HARRIET DOUGLAS CRUGER.

To make a finish. Know that I as much expected by the ceremony of the 29th of June, that Mr. C. would have become my agent, as that he would become my husband— and so did Mr. Halliday.

Now, without enumerating—but speaking to the experience fresh in all your mind's memories and I think all my other trustees have said they would not act if he became my agent—the time is past, I have no obstinacy to have Mr. Brown, but an insurmountable one to have Mr. H. again."

I truly believe my sister, in the declarations made in this letter, and that she will strictly adhere to them throughout her life.

E. M. MONROE.

*Dec. 20th,* 1836.

I have entire confidence in the above sentiments.　　）
　　　　　　　　　　　　　　　JOHN WHETTEN.　；
*Dec. 21st,* 1836.　　　　　　　　　　　　　　　｜　；
　　　(This schedule verified by the initials.)　　｜　，
　　　　　　　　　　　G. D.　　　　　　　　　　　　　'
　　　　　　　　　　　W. D.　　　　　　　　　；　．'
　　　　　　　　　　　H. D. C.　　　　　　　　　．　'

That the said complainant did not nor would acquiesce in or receive such last mentioned letter or the accommoda- tions therein proposed or any of them, but refused to receive the same, in consequence whereof the said last mentioned letter was, shortly after its date, returned to this defendant by her said sister as rejected by the said complainant. She denied that the said letter ever was put into the hands of the said complainant as a substitute for a regular deed or as having any validity. She was obliged at length to return to her home as aforesaid, without having effected any recon- ciliation with her said husband.

That the said complainant, on or about March 26 1837, when setting out on a journey to Virginia to make some in- quiries about the condition of certain lands there belonging to this defendant and her brothers, took with him the said letter of the thirteenth of November previous and had ever since retained the possession of it. That in the autumn of the year 1838 she visited England with the complainant; and whilst residing with him in London, was again impor- tuned to settle her income upon him ; that being in low health and spirits, alone with him and completely subject to his power and influence and being very much distressed and completely overcome and deprived of her free agency by his importunities, she requested him to take her home—and stated that she would give him whatever settlement he de- sired. But the said promise was not a free or voluntary act and ought not, under the circumstances, to be regarded as of any force or effect.

That the defendant prosecuted his demands for an irre- vocable settlement with such vehemence that her domestic peace was almost entirely destroyed. And that whilst she was in great distress from this conduct, her brother-in-law,

James Monroe, called on her and urgently requested her to make some arrangement which would be satisfactory to the complainant. Whereupon she, being worn out by such incessant importunity and most anxious for peace and repose, answered her said brother-in-law that she would sign whatever paper he might dictate, but that she would not live with the complainant after he should have accepted any instrument settling her income or any of it upon him irrevocably. That shortly thereafter, at the instance and on the dictation of the said James Monroe, she executed and handed the said James Monroe the paper mentioned in said bill and dated October 26th, 1839 ; and, also, the paper in the said bill set forth and dated November 2d, in the same year. That the said paper of October 26th was tendered to the complainant by the said Monroe and rejected as not sufficiently formal and binding to secure to him an absolutely independent power over the income. That the said James Monroe procured the execution of said paper, dated November 2d, in consequence of such refusal and of the desire of him, said James Monroe, to do whatever might be requisite to satisfy the said complainant. That the said James Monroe was not, in the procuring of the said two last mentioned papers signed by this defendant or either of them, the umpire, the agent or the friend of this defendant. But, that the same papers were extorted from this defendant ; and when she gave them, she did suppose they would take effect according to their terms, because she knew no means of avoiding any paper which she might be compelled to give to the said complainant. She denied that she, nine or ten days after the pretended exchange of the said papers, in the said bill mentioned or at any other time, wrote to the said complainant that her referee approved of the arrangement thereby effected—and the more so because the said complainant had acted so handsomely in returning a portion of what had been conveyed to him and that she, this defendant, would abide by it literally or anything to that or the like effect. That this denial is made according to the best of her recollection and belief ; that she could not recall to mind any such letter ; that she distinctly recollected that at the time referred to her mind was distracted with indigna-

1844.

CRUGER
*v.*
DOUGLAS.

tion and with the most painful emotions; and, that if there exists any letter containing words which resemble the matter in that behalf alleged in the said bill. the said letter will prove, on being exhibited, that such words were used and ought to be understood in an ironical sense. That shortly after the said second day of November, in the year last aforesaid, the complainant did return from Henderson aforesaid to the said house in the city of New York; and she, acting upon her resolution, did withdraw herself from the house and go to reside with one of her brothers. That she persevered in such resolution and the complainant did at length execute, under his hand and seal and forward to this defendant, the said paper, dated November second, together with the deed of cancellation release and extinguishment thereon endorsed and dated February 22d, 1840. And she claimed that the last mentioned deed was a complete, valid and effectual extinguishment of all right in her estate or any part or income thereof under or by virtue of any act or deed prior to that date. That the said complainant, on sending said papers, announced to this defendant and to her friends, by means of a letter to her sister Mrs. Monroe and another to her brother William Douglas, that having thus renounced his claim to the income of this defendant's estate, the existing separation should be continued and be thenceforth regarded as the act of him the said complainant and that, in surrendering the said paper dated November 2d, 1839, he surrendered with it all hope of ever being reunited to this defendant. That according to such announcement, instead of returning to New York from Washington city, where said deed of the twenty-second February purported to have been executed, he went to Charleston, South Carolina, and did not return to New York until June following. She admitted that in the same month, in anticipation of the said complainant's arrival in New York, she did go to her country residence at Henderson and there spent the summer. She admitted that, in the course of her correspondence with General James Hamilton, she did, on March 14th, 1840, write to him as for that purpose stated in the said bill. That the said complainant, on such his return to the city of New York, recommenced his efforts

to obtain a settlement upon himself of this defendant's income or some part thereof. And he did, by indirect means, enlist in his behalf the exertions of his own and this defendant's friends and relatives—and caused several of them to make applications for that purpose to this defendant at Henderson aforesaid ; and such applications were all accompanied by offers of a re-union, in case this defendant would give to the said complainant her income or some large part thereof. That whilst her relation with her said husband continued in this unhappy condition and about the twenty-fifth day of August in the year last aforesaid, the said William Bard, Esquire, a connection of the said complainant and at said complainant's request, as she was informed and believed, addressed to her a letter in the following words :

" 25th Aug. 1840.

"*My Dear Madam :*—I have been your warm friend ; and without concealing from you faults which I thought belonged to you, I have felt and acknowledged the influence of virtues which have led me sincerely to vindicate you where I thought you ought to be vindicated in the unhappy circumstances which have existed between you and your husband. You will, therefore, I know, do me and my motives justice, when I say to you that I fear your present position is unfavorable to your peace—and must, at least in one point, be altered, to enable you to justify yourself or your friends to justify you. You conveyed to your husband, irrevocably, the whole of your income—with the declaration that whoever conveyed the deed to him would separate you for ever. It was conveyed to him—did separate you, I hope not for ever—and was returned by him. When you sent it, I earnestly advised you to convey but one half ; and when he returned it, had I been near him, I would have advised him to return but half. Had either been, your difficulties would have been easier settled. As matters now stand, you feel that, unless you persevere, you abandon your grounds ; and if he yields, he feels not only that he is humbled, but that, however his own feelings of affection may lead him to do so, in the opinion of the world he is driven to a base humility from the love of your money—

"not of your person—from the love of ease and not from more worthy and better motives. My earnest wish is to see your relative positions altered, as the most likely and easiest means of future reconciliation. But whether reunited or not, your husband's situation at present, is one, I must say it plainly, as I have been accustomed to do, will do you discredit with the public and cannot be approved by those who most esteem you and most desire to see you happy. In such perilous controversies as controversies between man and wife, the party that wishes a quiet conscience must be very sure he is in the right and must take care that all has been done that can be done for peace. From the bottom of my heart I wish your happiness. You will excuse, therefore, my anxiety, when I think you in danger ; and that I press you, at least to do that which alone can secure hereafter your own or at present the approbation of your sincerest friends. Henry's present situation of absolute want of the means of respectable living, is not one worthy of you or him. And I earnestly press you to alter it, by settling on him immediately and irrevocably, if not one half your income, such proportion as will enable him to live as one ought to live who has been in the intimate relation of husband to you. I know your intention is, as you have frequently assured me, never to use, for your own purposes, the income you conveyed to him ; and that you now withhold it to repay the debts which he owes to your mother's or sister's estate. I have before said, I thought you carried this point too far. But if you leave him in his present situation, friendless and dependent, you carry it to a length that cannot be defended by your best and warmest friends—and will lose you the good opinion of the public. Now let me advise and beg you, for your own sake and in the opinion of one, though as partial to you as I am, absolutely your duty to do in this matter, what is plainly right. Make him easy as to his means of living, as is due to him and as your husband ought to be. No matter whether he does or does not come up afterwards to your ideas of what is right, no matter whether you live with him or do not live with him the remainder of his life. Put it out of the power of others to say you kept him on the rack till you forced

"an unwilling confession and that you looked on his distress triumphing in your power and hoping to force him to your terms. I know such feelings do not belong to you and are abhorrent to your nature. I am, therefore, doubly anxious they should not be imputed to you; and that your anxious friends, among whom I am, should be able to disprove them, by appealing to proofs of a more generous and higher feeling. With regard to the debts due to your mother's or sister's estate, the balance of the income, after deducting what will be proper for Henry, will soon pay their debts; and to leave your husband to starve, expatriate himself or to be dependent on the bounty of others, when you can prevent the necessity of either, would neither comport with your dignity, your character as a woman, nor your religion. Excuse, I beg you, my warmth and earnestness. It arises from the truest anxiety for your welfare, from the peril in which I see you are, and from my sincere desire of being able to vindicate you in all points against partial misrepresentations or unfavorable opinions.

"Affectionately and sincerely,

"Yours,

"Wm. Bard.

"Aug. 25th, 1840.
"N. Y. L. I. & T. Co."

That this defendant did, on the 29th of August 1840, answer such letter of the said Mr. Bard, in the following words:

"The spirit of this letter must be complied with! I hereby put at your disposal the whole of my present income, to decide absolutely what portion of it is to be assigned irrevocably to Mr. Cruger; and will you, dear sir, after having so decided, request Mr. Strong to reduce it to form and forward it to me for execution, for you cannot hesitate to decide on a portion, when I was willing to give the whole."

That conformably to the said correspondence and his opinion in the premises, the said William Bard procured and sent to this defendant at Henderson aforesaid, the paper in the said bill set forth dated September 7th 1840, which this defendant executed, acknowledged and returned to the said

Bard. But she insisted that the last mentioned paper was extorted from her by undue means and improper importunities, practiced by and at the instance of the said complainant ; and that the same paper was not a free and voluntary act. That the last mentioned paper was given by her and received by the said complainant, on the condition that by reason of the exaction thereof he and this defendant were to remain so living separate and apart.

That after this occurrence and on or about October 4th, in the year last aforesaid, to her great surprise, on returning to her house at Henderson aforesaid from church late on a Sunday evening, she found the said complainant in said house ; that on addressing the said complainant, she referred to the condition on which the said annuity was granted. But after considerable discussion, not seeing how she could do otherwise, she acquiesced in his remaining ; and by reason of the said complainant's promises and professions of *kindness, soon became* so far reconciled to his said breach of faith in exacting such annuity that she ceased to insist on a separation. That the said complainant and this defendant returned in November following to the city of New York and there resided until about June 1st 1841, in external harmony. But during the most of that time, the complainant was continually importuning and harassing this defendant, by speech and action, in relation to the alleged inadequacy of his said annuity and striving to obtain an irrevocable settlement upon him of the whole income. That as early as January 7th 1841, the complainant suggested doubts about the sufficiency of the said will of this defendant ; and, thereupon, with this defendant's consent, he drew up a case containing a copy of said will and certain questions as to the validity thereof, which was laid before George W. Strong, Esquire, for his opinion. And that Mr. Strong gave such opinion as stated in such bill ; and that she, this defendant, wrote such remarks upon the same opinion as are for that purpose stated in said bill. That when Mr. Strong gave said opinion, she asked him what should be done to obviate the difficulty suggested. Upon which said Mr. Strong advised this defendant to consult with said complainant. This defendant requested said Mr. Strong himself to

do so; and she was informed and believed that, on being applied to by said Mr. Strong, the said complainant produced and recommended as proper documents the said three papers before mentioned. That she declined uniting in the said three papers; and then, and not before, wrote the said remarks on such opinion. That from that time until about the first day of June next following, the said complainant importuned and harassed this defendant in relation to her said separate estate almost incessantly. And that her domestic peace being wholly destroyed by such conduct, she, at length, concluded that it was impossible to live with him. That she returned to her said original defensive resolution of 1839 and, accordingly, on or about the said first day of June, left her said house in Broadway; and she had not, since that time, lived with the said complainant.

That in order to make herself fairly understood, she, on or about the tenth day of the said month of June, addressed to the said George W. Strong, Esquire, a letter, to be communicated to the said complainant, in which she fully explained her aforesaid views; and stated her said resolution not to live with him so long as he continued to claim a title to any part of said income—but that to relieve herself from his importunities, she would yield to his demands. And she, this defendant, in such letter, gave the said complainant his option, to live apart from this defendant and receive the said annuity of $3,000 mentioned in said paper, dated the 7th day of September then next previous. or the whole income of her estate, except about $3,000 a year and the said house in Broadway or to relinquish all claim whatever to any part of said income and to enjoy with this defendant the whole of such income; the agent to honor his, said complainant's, drafts or those of this defendant—each to keep an account of disbursements upon a plan to be mutually agreed upon—and each regularly and cheerfully to submit his or her accounts and disbursements to the other for approval; and requested that the said complainant should make up his mind definitively thereon by the 1st day of November then next. That on so leaving said house in Broadway, she went to reside with one of her brothers and also spent part of the summer at Henderson; but that, until the said first

1844.

CRUGER
*v.*
DOUGLAS.

day of November, she occasionally visited the said house in Broadway, in which the said James Monroe and his family and the said complainant then resided ; the object of such visits being to conceal from the public the fact that she, this defendant, was so separated from her said husband, until she should ascertain with certainty whether he could be induced to abandon his attempts to acquire an interest in said income and return to an observance of the terms of their said ante-nuptial agreement. That she holds a paper in the proper hand-writing of the said complainant. Which said paper is in the following words :

" *Substance of a conversation with Mr. Strong at my office,*
*17th June,* 1841."

" At the instance of Mrs. Cruger, he made verbally two propositions. First—That her deed of appointment of September last would be cancelled and that the agent should hold the whole income subject to our drafts indifferently. I enquired what security I was to have that this arrangement would not be rescinded. He answered, none but her good faith.

" I replied, that this was going back to precisely the loose state of things and of pecuniary dependence and subjection on my part, out of which all our difficulties had arisen ; and that, having been twice warned of its evils by her revoking the order to her trustees to pay me the income, for both our sakes, I would not consent to the arrangement.

" Second—That she would secure to me the entire income, reserving to herself the use of the house in Broadway and the income to which she is entitled from her mother's estate, but she would then separate herself from me.

" To this, my response was that I would listen to no proposition whatever involving a separation. That Mrs. Cruger had no right to separate herself from me. That this would be no cause nor had I ever given her any for doing so.                    HENRY D. CRUGER."

That the said complainant wrote to this defendant, bitterly complaining of this defendant's conduct in declining to settle upon him unconditionally the income of her estate ; that he refused to visit this defendant either at Henderson

or at her brother's, about twelve miles from the city of New York, on account of its incompatibility with his alleged professional occupations in the said city—and repeatedly declared in the most positive terms that he and this defendant never could enjoy peace or happiness together until this defendant should cause to be definitively and formally settled upon him the income of her estate or, at least, one half of it.

That she returned to the city from her said country residence on the 18th of October, 1841 ; that she went immediately to the house of her cousin Mrs. Eliza C. Kane and there met the complainant and had a very painful interview with him.   That the said James Monroe alone or conjointly with the complainant instructed his wife, Mrs. Elizabeth Mary Monroe, the only surviving sister of this defendant, to procure from this defendant an appointment of one half of the said income to the use of the said complainant.   That all the acts and proceedings of the said Elizabeth Mary Monroe were guided by the complainant either directly or indirectly through the agency of the said James Monroe ; and that the said complainant at the time, by some indirect means, procured for the attainment of his said designs on the income of this defendant's estate the aid and assistance of the said Mrs. Eliza C. Kane and of Francis B. Ogden. That immediately after this defendant's said return to the city, the said Mrs. Monroe, aided and seconded by the said Mrs. Kane and Mr. Ogden, addressed this defendant and requested her to settle upon the said complainant the one half of the income.   This defendant replied to such request, that by virtue of her said offer of June previous, which still lay unrescinded, he, the complainant, had the liberty of ta·king nearly the whole of said income ; and it was, therefore, unnecessary to apply to this defendant for a smaller sum. That her said sister, aided and seconded as aforesaid, treated such answer with ridicule and derision—stated that this defendant had no right to give the whole—but was bound, in order to save herself from general censure, to give to said complainant one half of such income.   That her said sister, so aided and seconded by the said Mrs. Kane and Mr. Ogden, pursued such application to this defendant for a settlement of one half of said income upon the said complainant

unceasingly and in so harassing and importunate a manner as to leave this defendant no peace or quiet. That she re-sisted the said application and importunities of her said sister to the utmost of her ability : but at length her powers of resistance failed her; and she yielded—and directed her said counsel to draw the required settlement. That the said George W. Strong accordingly drew up an instrument, bearing date 26th October 1841 and to the same purport as the paper last set forth in the said bill, except that the settlement therein named was for the life of this defendant. And she signed and sealed the same.

That the said paper was tendered to the complainant and that he refused to receive the same. That at this stage of the controversy she was again addressed by her said sister, aided by her cousin and Mr. Ogden, with complaints against the frame of the paper—in this, that it was for the life of this defendant only instead of being for the life of the complainant. They also charged this defendant with having, after her aforesaid submission to their requests, given private instructions to her said counsel to draw the same paper in such unsatisfactory form and renewed their said importunities, censured her for unreasonable obstinacy, threatened her with public odium and continued such importunities until on or about the 8th day of November in the year last afore-said, when they literally compelled this defendant to secure her tranquility by agreeing to make the said settlement upon the said complainant of half the income of her estate during the life of him, the said complainant, which was going beyond even her said offer through the said Mr. Strong. That having so yielded, she accordingly sent for the said George W. Strong. But, before he called on her, she was obliged suddenly to leave the city for the purpose of visiting a sick friend. She stated to her said sister that she might give such instructions as she thought proper to the said Mr. Strong for the preparation of said settlement. That agreeably to the instructions of her said sister the said Mr. Strong prepared the said paper dated November 19th 1841—and on the ninth day of that month submitted the draft thereof to the said complainant for his approval. That the said complainant, on receiving such draft, instead of acquiescing

therein did, on or about the 10th day of November in the year last aforesaid, submit to the said Mr. Strong a counter-project for a settlement, of which a copy was contained in a schedule annexed to her answer. That the said complainant was given to understand that the paper so proposed by him would not be executed. That after considerable hesitation and on or about the 17th day of November in the year last aforesaid, he signified to the said Mr. Strong that he would accept as satisfactory the said paper dated the 19th November. Whereupon the same was signed and acknowledged by this defendant and sent to said Mr. Strong, who delivered it to the said complainant. And this defendant denied that the said last mentioned paper emanated from her own free will or was obtained without the privity of the said complainant; and she also denied that it was executed whilst she was beyond the said complainant's influence or when he had not seen her for a long time. That during the period of twenty days which intervened between her said arrival in the city of New York and the submission of the draft of such paper to the said complainant, she had had one extremely painful interview with the complainant as aforesaid and was obliged, by the importunities aforesaid, to execute one instrument in favor of said complainant which was rejected by him—and was also obliged to give a reluctant assent to another, purporting to give him further rights. That the said Mrs. Monroe, Mrs. Kane and Mr. Ogden, during the said twenty days and until said paper bearing date November 19th 1841 was executed, were in constant correspondence with said complainant in relation to the obtaining from this defendant such last named paper or some similar document and that all their said urgency, applications and importunities were at the instance and request and with the knowledge and privity of the said complainant.

That although the said complainant so received the said last mentioned paper with the understanding on his part and on the part of this defendant that they were to live apart, yet he remained in the said house of this defendant in Broadway, thereby excluding her from the enjoyment thereof until May 1842, when the said complainant removed therefrom and this defendant has ever since occupied it.

That she has in her possession various letters written by her to him which he lent to her under a promise that the same should be returned to him ; but not any other papers or documents as far as she could remember ; and she said that, on being allowed a reasonable time to take copies thereof, she was willing to return the same letters to the said complainant, provided he would deliver to her or her trustees the papers and documents belonging to her estate in his, said complainant's, possession. That the two wills and the papers respectively dated October 26th and November 2d 1839, January 29th 1841 and November 27th 1836 were in her possession, but the said complainant did not lend the same or any of them to her. And although some of them were occasionally in the possession of the said complainant who always had free access to this defendant's papers while living with her—yet she had a right to retain the same.

That said papers respectively, dated September 7th, 1840 and November 19th, 1841, were and each of them was obtained from her in opposition to her will and by the persevering and vexatious importunities of the said complainant and his agents ; that neither of them was a free or voluntary act ; and that the same were and each of them was obtained fraudulently against good faith and contrary to the true intent and meaning of the said ante-nuptial agreement and of the said deed of June 29th, 1833. And that her said separate estate ought to be exonerated and discharged from all claims or demands of the said complainant or any other person on account thereof. She admitted that no physical force was employed to compel her to execute the said paper of November 19th, 1841 ; and that she was, at the time of the execution thereof, exercising such independent and separate power of locomotion, without reference to the will or pleasure of the said complainant. That he persevered in threatening this defendant that she could have no peace, comfort or happiness or save herself from the odium of all who should believe his, said complainant's, representations until she should execute to him, said complainant, such settlement of her estate as he should be content to accept. She denied that there ever was any agreement or any promise that the said complainant should have

the income of this defendant's property during his life, leaving the principal to her heirs. That the said complainant did, at the request of this defendant, acting for herself and others, members of her family, devote some but not any very great amount of time, to settling and adjusting their several estates and, that he caused the business to be brought to a close. And that for such services the said complainant was allowed and paid the sum of $10,000. That she never did persuade or wish the said complainant to withdraw from or discontinue his professional business. That, although true it is that, by mutual assent of herself and her said husband, a new country house was erected in the years 1835 and '36 upon land belonging to this defendant at Henderson aforesaid, yet, that she did not believe that the said house was erected against his own judgment or wishes or merely to gratify this defendant. But this defendant denied that the said complainant's management of the property in the county of Herkimer rendered the same more productive or profitable to her estate. That the large loans to relatives of the said complainant mentioned in the bill out of the cash capital of this defendant's estate, together with the said complainant's own drafts from such capital, amounting in the whole, with interest, to about $70,000, had greatly diminished the income of her said estate. And this defendant admitted that, either before or after the making thereof respectively, she had expressed her acquiescence in such loans; and, although some of them were made without her previous assent, yet, for peace sake, she afterwards acquiesced. And she also admitted the assent of said Robert Halliday; but this defendant could not admit that the responsibility alleged in said bill to have been incurred by the said complainant, by giving or joining in bonds for such loans, afforded any security to this defendant for the re-payment thereof or was any fulfilment, in part or in whole, of any agreement between the said complainant and this defendant. And this defendant admitted that, when suffering under the importunities of the said complainant, but at no other time or times, she repeatedly offered to give to the said complainant the said bonds and mortgages and securities for the loans to his said relatives

in the said bill mentioned; but she denied that he, the said complainant, ever accepted any such offer. That she never freely gave the said bonds, mortgages and securities to the said complainant—and that, if the said complainant ever had any title or pretence of title to the same, he wholly relinquished and surrendered the same for the benefit of this defendant's separate estate by the said instrument dated the twenty-second day of February one thousand eight hundred and forty in the said bill set forth. That on or about March 19th, 1841, Frederick De Peyster was employed as agent. That said newly employed agent was instructed by this defendant's trustees to collect all arrearages of interest upon the bonds and mortgages belonging to her estate. And, in case it should become necessary, to foreclose the mortgages and collect both principal and interest. That the said complainant treated with her said agent and trustees for permission to retain the said bonds, mortgages and securities, for the purpose of collecting the same—and had never, in fact, given up or transferred them or any of them to this defendant, her said trustees or agent; but, on the contrary, at last, when urged to deliver up the same to said agent, wholly refused so to do.

And the defendants, George Douglas and William Douglas, answering, said they had a personal knowledge of very few of the foregoing matters; but, they were informed and believed that the several matters set forth by the said defendant, Harriet D. Cruger, were true and they, therefore, insisted on the same. They admitted that after receiving the said paper, dated November 19th, 1841, in the said bill mentioned, the said complainant applied to the agent of the said estate for a balance sheet of the estate; and that an accountant was employed to prepare the same at the expense of the said estate; and that the complainant had frequently applied for the same account and that these defendants refused to furnish the same; and also, that the said defendants, George Douglas and William Douglas, with the knowledge and consent of this defendant, Harriet D. Cruger, had, through the said agent, from time to time, for about twelve months, made payments to the said complainant, in pursuance of the terms of the said last mentioned

paper and had so far acted upon the same.  And that they, these defendants, were under the belief and impression, until about November 14th, 1842, that the said complainant (having, as aforesaid, extorted the said last mentioned paper from the defendant, Harriet D. Cruger) could enforce the same according to its terms and that these defendants had no remedy against the fraud and injustice attempted to be perpetrated by means thereof.  But these defendants on or about the last mentioned date were advised that the same was void at law and in equity.  That by reason of such advice they had ever since refused to recognize the same or to make any payments thereunder.  And that the same balance sheet not having been completed until after they had received such advice, they, of course, refused to exhibit the same to the complainant when it was completed.  And these defendants denied that they were regardless of their duties as trustees.  That they had executed the same with ordinary care and ability and to the entire satisfaction of the defendant Harriet D. Cruger ; and that they were perfectly solvent and able to make good any loss of said estate for which they might be made chargeable.  And these defendants denied that they were ignorant of or incompetent to perform the duties of trustees.  And this defendant Harriet D. Cruger, further answering, admitted that ever since her said marriage she had been and was willing and desirous to live with the said complainant as his wife and to suffer and permit him to enjoy all the benefit of her whole income ; but that so long as the said complainant, in violation of the said ante-nuptial agreement and of the said post-nuptial settlement deed, insisted on having a right in or title to the income of her said estate real or personal or any part thereof she could not consent to live with him ; that she could not so far control her feelings as to associate in her own house on terms of affectionate intercourse with one whose daily acts of dominion over her property would continually bring to her mind the injustice by which that dominion was acquired.  These defendants admitted that at the time of the said marriage the personal estate of the defendant, Harriet D. Cruger, amounted to about $135,000 in value and her real estate to about $130,000 in value.  That the income of

1844.

CRUGER
*v.*
DOUGLAS.

her whole estate real and personal did not exceed $10,000. The defendants insisted that the post-nuptial settlement deed was not void, but was valid at law and in equity. And that if the same or any part or provision thereof was void as being repugnant to the revised statutes of the State of New York or otherwise, then, the said complainant was bound by the principles of equity and ought to be decreed to execute or unite in proper instruments and conformably to the ante-nuptial agreement between him and this defendant Harriet D. Cruger, subject to the trusts and powers in that behalf above mentioned or so settle all the estate and interest in such property which he, the said complainant, could or did acquire at law by or by means of the said marriage. And this defendant Harriet D. Cruger, further answering, said that the said post-nuptial settlement deed was executed by the said complainant in consideration of the said ante-nuptial agreement and of the said marriage duly solemnized upon the faith thereof and was delivered to and accepted by this defendant and her said trustees as and for a compliance therewith and upon the representation of the said complainant that the same was a valid and binding instrument and effectual for the purposes so as aforesaid contemplated by the said ante-nuptial agreement.

A cross bill was filed by the wife, wherein she showed that the said Henry D. Cruger, in consideration that she would marry him, did undertake and faithfully promise her that he, as soon as conveniently practicable after the then intended marriage, should and would cause all the property, real and personal which she might have at such marriage and all income thereof to be settled on her and vested in trustees in such proper and usual manner as the laws required and permitted and as counsel should advise for the purpose of securing the whole principal and income to her sole and separate use during coverture, free from any control or interference of the said Henry D. Cruger and excluding him from acquiring through or by means of such marriage any right whatever in such property or the income thereof and that she should be vested, notwithstanding such expected coverture, with the fullest powers of disposition and control over the said estates and income that the laws

would permit in a marriage settlement for the purposes
aforesaid. That, at the instance of the said Henry D. Cru-
ger, she thereupon consented so to marry him and that re-
lying upon the promise and undertaking aforesaid and in
pursuance of the ante-nuptial agreement so formed between
her and him as aforesaid and in performance of such agree-
ment on her part, she married. That the execution of for-
mal instruments, so settling her said property as aforesaid,
was deferred, at the special instance and request of the said
Henry D. Cruger, until the said marriage should have been
solemnized, in order to prevent the implication which he,
the said Henry D. Cruger, alleged would arise from any
earlier execution thereof that full confidence had not been
reposed in his honor and integrity—an implication which
he alleged was offensive to self-respect and tended to de-
grade him in the estimation of others. That immediately
upon the solemnization of said marriage, the said Henry
D. Cruger, in her presence, delivered into the hands of one
of the trustees therein named, who was then present, as the
act and deed of him, the said Henry D. Cruger, the said
deed of marriage settlement dated the twenty-ninth day of
June one thousand eight hundred and thirty-three ; and he
insisted that the same was good and valid, but, still, was
so inartificially and unskilfully expressed as to render its
validity, in some respects, liable to be questioned—and ought
to be made good in equity. That the order of the fifteenth
day of July one thousand eight hundred and thirty-three
was given merely for the purpose of facilitating the dis-
bursement of 'her income as, from time to time, she might
desire and was merely temporary and revocable in its na-
ture. And that transfers or papers of the seventeenth day
of September one thousand eight hundred and forty and the
nineteenth day of November one thousand eight hundred and
forty-one were obtained by the unkindness of the husband,
Henry D. Cruger, and by excessive and irresistible persuasion
and importunity and threats and coercion practiced upon
her, the said Harriet Cruger, by him and others acting (as
she believed) on his request and by his procurement ; and
that these two papers were not voluntary acts, but were
obtained by undue means and were void. *Prayer :* That

1844.

CRUGER
v.
DOUGLAS.

the said Henry D. Cruger might be decreed specifically to execute the said ante-nuptial settlement or duly to execute such deed of marriage settlement as was designed and intended by him when he made the said deed of the twenty-ninth of June 1833. And that proper instruments for these purposes or one of them might be settled by or under the direction of the court and duly executed by the proper parties and that whatever was or might be defective in the said deed of marriage settlement of the twenth-ninth day of June 1833 might be reformed and corrected and supplied by the court so as to bind the said estates real and personal and quiet the complainant and her trustees in the possession of their respective rights therein. And that the said Henry D. Cruger might deliver up all the said papers or transfers of the seventeenth day of September one thousand eight hundred and forty and nineteenth day of November one thousand eight hundred and forty-one, to be cancelled; that he might be restrained by perpetual injunction from making any further claims under either of the said two last mentioned papers; and that he might be compelled to perform and execute all such acts and deeds as the court should direct; and, further relief.

By the answer to this cross-bill the defendant therein, Henry D. Cruger, denied that the papers or transfers of 1840 and 1841 were obtained by unkindness, threats or coercion or by improper persuasion or importunity or by any undue means; that the same were binding on the said Harriet Cruger and her trustees; and that she was estopped, by her acknowledgments thereto, from denying their validity as free acts. Much of the matter embraced by the original bill was turned into the answer to the cross-bill; and the defendant therein set up the statute entitled of "Fraudulent conveyances and contracts relative to goods, chattels and things in action" against the alleged ante-nuptial parol agreement.

Both causes came up together on pleadings and proofs. A mass of testimony, with many exhibits, embracing private letters, was used. But it is believed that the pleadings set forth and the facts and circumstances embraced by the

opinion of the court will be found quite sufficient for an understanding of all useful points involved in this case.

Mr. *Thomas L. Wells*, Mr. *Anthon* and Mr. *George Wood*, for Mr. Cruger.

Mr. *Charles O'Conor*, Mr. *Bidwell* and Mr. *B. F. Butler*, for Mrs. Cruger and George and William Douglas.

THE VICE-CHANCELLOR :—The bill in the original cause is filed by Mr. Cruger against his wife and her two brothers, who claimed to be trustees of her estate, for the purpose, in one aspect, of ridding the estate of the trust, in order that there may be no obstacle in the way of his asserting the common law rights of a husband to the property of his wife ; or, in case it shall turn out that there is a valid subsisting trust under which the property is held, then, that he may have the benefit of a deed of appointment executed by her under date of the 19th November, 1841, purporting to give him one-half of the net income of the whole estate real and personal during his natural life : and the bill calls upon the two brothers of his wife, either to yield the possession of the property to him to be managed as a husband is entitled by law to manage, possess and enjoy the property of his wife or else, in their capacity of trustees, to perform their duty in respect to the making of investments, the collection of rents and income, the paying of dividends and the rendering of proper accounts· or that they may be removed from the trust and other trustees appointed in their stead.

*Aug.* 26, 1845.

On the other side, the cross-bill, filed by Mrs. Cruger against her husband, has for its object—first, the establishment by decree of this court of a deed of settlement executed by him immediately after the solemnization of their marriage on the 29th of June 1833, by which she claims that the whole estate both real and personal became and was vested in trustees for her use and subject to her appointment and disposal as if she were unmarried and to be held and kept during the marriage entirely exempt from his control ; and secondly, it seeks to annul and have de-

clared void all appointments and settlements of the income which she at any time may have made upon or in favor of her husband and especially the last act or deed of the kind executed by her under date of the 19th November, 1841, before mentioned.

This presents a very general view of the nature and object of the suit on both sides; and it will readily be perceived that this court can deal with the controversy only so far as property is concerned. Over the conduct and acts of the parties, except with reference to their respective rights of property and for the purpose of enforcing those rights when ascertained, this court can exercise no control. It has not jurisdiction to compel cohabitation where one party withdraws from the society of the other without justifiable cause nor to decree a restitution of conjugal rights withheld. Whether the decision I am about to make will have a tendency to produce such desirable results from any moral force or influence it may carry with it, I cannot undertake to predict; but I will indulge the hope, that the questions, which have so long agitated the minds of the parties, in relation to the property, being once settled by a definitive sentence or decree upon just and equitable principles, there will be nothing left to disturb the peace and harmony that always should subsist between intelligent, upright and virtuous minds and that they will see the importance of returning to those duties which the domestic relation requires and which, as enlightened members of a moral and Christian community, is demanded of them.

The first question to be considered is, on the validity and effect of the husband's deed of the 29th day of June 1833, as constituting a post-nuptial settlement of the property upon the wife? The whole of the property belonged to her before the marriage and the absence of anything in the shape of a marriage settlement would leave him to enjoy the legal rights of a husband over her property which could not be disputed.

Much, therefore, depends upon this instrument; for, if it cannot be sustained of itself or as evidence of an ante-nuptial agreement which the court is bound to carry into effect, then, all the court has to do is to pronounce it a nullity and

leave the husband in the possession of the rights conferred upon him by the marriage.

In the first place, the instrument is alleged to be void upon its face, for the reason that there is no consideration expressed.

The statute relative to fraudulent conveyances and contracts, 2 R. S. 134, 135, does indeed require that certain contracts or agreements, in order to be binding, must be in writing and must express the consideration and must be subscribed by the party or his agent. But, this provision of the statute has reference to executory contracts or agreements, such as rest in covenant or promise to do or perform some act in future and does not apply to contracts executed by the act or deed itself. This is manifest from another section of the same statute : "No estate or interest in lands, (other than leases for a year) nor any trust or power over or concerning lands or in any manner relating thereto shall be created, granted, assigned, surrendered or declared, unless by act or operation of law or by a deed or conveyance in writing subscribed by the party creating, granting, assigning, surrendering or declaring the same, &c."

Here, no mention is made of a consideration expressed. In an instrument, therefore, which of itself creates and passes the estate, title or interest by words of grant, assignment, surrender or declaration of trust, it is not necessary that it should express the consideration on which it is founded. A consideration is implied from the fact of the party's signing and sealing the instrument, and this is sufficient to support it as a deed until it is impeached or invalidated for some other cause. Now, the deed in question is not in terms executory or promissory. It is not a covenant or agreement to do something in future, but it is an act or deed by which all that was ever contemplated is done and accomplished at once. It speaks in the present, not in the future tense. It purports to divest the husband of all interest and right in his wife's property which he had acquired at law by the marriage and to vest it in trustees for her separate use. The language of the deed is, that he thereby freely, fully and unreservedly releases and conveys all the estate both, real and personal, of the wife which she

then owned or might afterwards acquire and all his right, title and interest therein, &c. It is, therefore, an executed, not an executory instrument and does not belong to that class of written instruments which are declared void by the statute of frauds for not expressing the consideration.

The next objection taken to this instrument is that, if not void for want of an express consideration, still, that it is void by the statute of uses and trusts, as containing a trust not sanctioned by that statute: 1 R. S. 727, § 55. The trust as declared is that the trustees are "to hold and keep both the principal and interest thereof (that is of the whole estate) during the said marriage exempt from his (the husband's) debts, contracts or control; to be managed and disposed of on her separate orders or receipts or by her deeds or will, so that she may enjoy and dispose of the same as it came from her parents and sister or may hereafter in any manner accrue to her in all respects as if she were unmarried." In the matter of time or duration the trust is not objectionable, for it is to continue only during the marriage of the parties and by no possibility can this extend beyond the life of the wife. The objection, however, rests upon a more formidable ground, viz.: that by the terms of the deed the trustees are not required to perform any active duties in the management of the estate or in the receipt of the rents and profits and the application of them to the use of the wife, but the wife herself, instead of being a mere recipient or passive party, is constituted the active party in the trust to manage the property in all respects as the legal owner. That such a mere nominal trust is contrary to the policy of the law and the spirit and intention of the statute is not now to be questioned. The final decision in the case of the Lorillard Will and in other cases subsequently has settled that point. The question is, whether the trust here created or intended so to be is of that character? It must be admitted that the deed is informal and the trust inartificially expressed; but it does not follow that it will be disregarded on that account as entirely ineffectual. This court looks at the substance rather than at the form of things and endeavors to ascertain the object and design of every deed or instrument brought before it. If the words used admit of dif-

ferent meanings, by one of which the instrument may be good and by another void, the duty of the court is to attach to them the meaning that will uphold rather than the one that will overthrow the deed. The words of strongest import against the validity of the trust in question are these: "To be managed or disposed of on her separate orders or receipts or by her deeds or will, so that she may enjoy the same in all respects as if she were unmarried"—carrying with them the appearance of an intention to place the whole property in her possession and to leave it to her management as well as to her ultimate disposal as though she were a *feme solé* and as though trustees were but nominal parties in the deed and had no duties to perform; but when these words are read in connection, as they must be, with those that precede them a different sense is conveyed. The words that precede are words of a lease and conveyance to third persons by name. They are sufficient to pass whatever legal interests or rights of property the husband had acquired in the estate of his wife by the marriage; and the trustees became vested with those rights by the delivery and acceptance of the deed: *Cunningham* v. *Freeborn*, 11 Wend. 247, 248. From that moment their duty as trustees commenced. It was an active trust they were called upon to execute—a trust in the first place " to hold and keep both principal and interest of the whole estate during the marriage exempt from the husband's debts, contracts or control." How could they hold and keep and protect the property and especially the income from the husband and against his creditors, without taking it into their own hands and under their control? To have it in the possession of the wife and under her management would be to leave it still in the husband's possession and under his control. Her possession would, in legal contemplation, be his possession and the declared object of the deed might, therefore, be defeated. It must not be supposed that the parties intended such a result. On the contrary, it was as necessary to vest the trustees with the actual possession as with the legal title; and both being united in them the active management of the estate at once devolved on the trustees, one of whom (Mr. Halliday) immediately entered upon the du-

ties of the trust and did, in fact, take charge of and manage the estate.

So far, therefore, as respects the commencement of the trust clause in the deed, viz. : " to hold and keep the property," &c. for the purpose of protecting it against the acts of the husband himself, it appears to be free from the objection that no active duties on the part of the trustees were required.

Do the words then which immediately follow, " to be managed and disposed of on her separate orders or receipts," &c. take from it that character? In my opinion they do not. It is very evident they were not intended to relieve the trustees of their duties and to convert them into mere automata or nominal parties to the trust. No such meaning ought to be given to the words and the whole taken together ought not to bear that construction. A more consistent and rational understanding of them is that they were meant to designate the wife as the sole beneficiary of the trust—to point out very generally the manner by which she might receive and enjoy the benefit of the property free from his control, viz. : by orders on the trustees and receipts to them in her own name and by ultimately disposing of the estate as she might see fit. The latter is in the nature of a power of appointment to be exercised by deed or will.

Still, the question is not wholly disposed of ; for, although one objection is removed, another remains. The trust as declared is not in the words of the statute, " to receive the rents and profits and apply them to the use of the wife." It has been held repeatedly not to be essential to the validity of the trust that it should be expressed in the very words of the statute. A deviation in the phraseology will not vitiate, provided the object of the statute is substantially complied with : *Gott* v. *Cook*, 7 Paige, 538, 539 ; and here I think there is a substantial compliance with the statute.

It follows, from the nature of the trust, that the trustees must receive the rents and profits. This, as already shown, is a part of the active duty belonging to the trustees to hold and keep both the principal and interest exempt from the husband's debts, contracts or control ; and when the money is paid over upon the wife's separate orders or receipts, it

is applied to her use within the meaning of the statute: *Gott* v. *Cook*, supra.

I have thus far considered the question on the law of trusts in relation to real estates; the statute of uses and trusts having reference solely to that species of property. But with regard to the personal property embraced by the same deed of settlement, it will be perceived that the trust is equally free from any well founded objection.

We have no statute declaring how or for what purposes personal property shall or may be placed in trust nor imposing any restriction upon trusts of personalty, except trusts of accumulation for the benefit of minors, which are to be limited to their respective minorities and all beyond that period are made void.

There is a statute, also, against suspending the absolute ownership of personal property beyond the period of two lives in being and, by which, moreover, limitations of future and contingent interests in personal property are subjected to the same rules as prescribed by another statute in relation to future estates in lands; but none of these statutory provisions touch the deed in question. There is here no trust for the purpose of accumulation—nothing that operates as an undue suspension of the absolute ownership of property and no violation of the rules of law in regard to future or contingent estates.

If I am correct in holding this to be a valid deed of settlement upon its face and the trust, such as, upon a fair construction, the law has not prohibited, then, it becomes unnecessary to determine whether there was or was not an agreement ante-nuptial on which it was founded. The parties are at issue on that point. The wife claims for the deed that it was executed in pursuance of a previous agreement or understanding which formed a condition on which she entered into the marriage compact; and that, however informal or defective the instrument might prove to be, there being ample consideration in the fact of a previous agreement, this court will reform the deed if necessary and sustain and establish it as a valid settlement upon her.

On the other hand, the husband denies that any previous agreement existed for a settlement as a condition of the

marriage or otherwise; and he asserts that the deed as exe-
cuted and delivered was a voluntary offering on his part.

The proofs in the cause do not furnish direct and positive
evidence of a previous agreement by which the property
was to be settled upon the wife after the marriage. In all
probability it was a point about which they had not speci-
fically agreed, although a wife's right to retain the control
and exclusive ownership of her estate after marriage had
been often and for a long time a subject of discussion be-
tween them. She had been taught to believe in the supe-
riority of the wife's right in that respect over the marital
right which the common law confers upon the husband;
and she appears to have adopted it as a fixed principle in
relation to her property never to surrender the control and
ownership of it to a husband any further than to allow him
to enjoy the income with herself and to be a disbursing
agent of it for their mutual benefit. To this, as a principle
of her life, she has clung ever since the marriage, even at
the sacrifice of her domestic peace and happiness. Still, I
believe the marriage took place without having that point
conceded to her, but, as I have no doubt, under the fullest
persuasion in her own mind, that her husband, understand-
ing as he did her sentiments upon the subject, would fulfil
that expectation and relinquish the right which the law
would give him over her property and, that knowing her
wishes and actuated by a desire to gratify them, he pre-
pared the instrument beforehand and upon the solemniza-
tion of the marriage promptly and generously executed it,
divesting himself of all right of property in her estate which
he had but that instant acquired. This view of the cir-
cumstances which led to the making of the deed and under
which it was executed and placed in the hands of the trus-
tees, tends to the removal of all conflict in the statements
of the parties concerning it.

The next question, then, is upon the character of the
order of Mrs. Cruger upon Halliday, the acting trustee and
agent of the estate, under date of the 15th day of July,
1833, by which he was authorized to pay to Mr. Cruger the
income of the estate as it should accrue. Was this a mere
authority for him to receive the income as being still the

money of the wife or is to be regarded as an appointment under the deed of settlement irrevocable in its nature and by which the income of the estate was given back to the husband as his own ? He claims for it the character of a gift to him of the whole income made in fulfilment of a verbal declaration of hers to that effect on the evening of the marriage, in consideration of having executed the deed of settlement. Her answer called for upon oath and responsive upon this point, denies that such was the origin and object of this order. She says that, feeling gratified by his conduct in executing the deed and having previously intended to allow him to enjoy the income of her property in case he should survive her, she called upon some of the persons present on the occasion of their marriage to witness her declaration, that if she should die before having an opportunity to make a will, it was her will that her husband should enjoy the income of her property during his life ; and she positively denies that she made or intended to make, by that act or declaration, any other gift or disposition in favor of her husband than by a verbal or nuncupative will to take effect at her death in case he should survive her.

That the purport and design of her declaration so made was testamentary, is placed beyond all doubt by the concurring testimony of the Rev. Dr. Phillips, the Rev. Dr. Wainwright and Mr. Monroe. They prove that it was expressed as her "will" to take effect in the event of her death suddenly occuring before one in writing could be prepared.

Her husband had just parted with all his interest in her property and she wished to guard against a contingency by which he might be deprived of all benefit from the income of the estate which she intended he should have during his life in the event of his surviving her. Such a disposition of the income would, of course, take effect only at her death ; a thing very different from a gift or an intended gift to take effect or become absolute in her life time. She denies, moreover, in her answer, that the proposed nuncupative will had any connection with the subsequent giving of the order of the 15th of July or that the latter was in

confirmation and fulfilment of the alleged gift of the income made by the former or intended thereby. I am bound to believe her statement in this particular, because it is responsive to a direct allegation of the bill and the denial is not disproved by any evidence in the cause.

The answer likewise explains the circumstances under which the order was made and states her reasons and motives for it; all of which are perfectly in keeping with the idea of its being a mere matter of business arrangement between herself and husband and not a gift of the income to him. She appears to have been made aware of the embarrassment that might arise from her undertaking to make deposits in banks on her separate account and to draw checks in her own name; and deeming it to be (as she very properly might) the more appropriate duty and business of her husband to look after her income and to attend to the disbursing of it in their personal and family expenses and being anxious, at the same time, to save his feelings from all seeming distrust and to show how unbounded was her confidence in him, she subscribed the order in the very significant and feeling manner expressed upon its face.

Some effort has been made to support the husband's claim under the order as a purchase of the income founded on the consideration of his relinquishing a lucrative profession on entering into the marriage; and, on the other hand, numerous facts and circumstances have been adduced in argument to prove that no such idea could have existed at the time nor for a long time afterwards, even in the mind of the husband himself; and that his letters on various occasions and his acts and proceedings during a series of years are opposed to any such construction being given to the transaction.

There is much force in the argument drawn from these sources, but it is unnecessary to dwell upon them here. An attentive consideration of all the circumstances has satisfied me that the order of the 15th day of July, 1833, was not given as an irrevocable appointment of the income to the husband in effect restoring to him his marital right in the property and that such is not the true character and was not the intention of it.

Thus far, then, we find that, by the husband's deed of settlement, the whole property, capital and income, was secured to the wife; and by her order a stewardship was created in the husband over the income, which involved in itself the duty of keeping accounts. This duty, in fact, he undertook to perform; but it appears soon to have become irksome to him.

At the second anniversary of their marriage the discovery was made that the sums drawn from the trustees and expended had exceeded the income. This circumstance and the trouble of keeping minute accounts led to dissatisfaction and produced some difficulty. It was a cardinal rule with her not to allow the capital of her estate to be encroached upon or diminished; and although the husband immediately upon its being discovered made good the deficiency out of his own resources, it showed the necessity of more economy and a closer attention to the keeping of accounts. The latter duty had a tendency rather to increase than to remove the cause of his discontent. This is shown by his handing back to her the order, with liberty to her to revoke it if she pleased. She, however, did not revoke it, but addressed to him a note under date of 29th of June, 1835, by which she proposed to relieve him in some measure from the trouble of keeping minute or detailed accounts and to allow him to retain a specified part of the income for his own sole use and without any accountability to her for it.

The terms thus proposed she offered to confirm by orders or directions to her trustees. All this was done as she says—and she speaks responsively—not for the purpose of creating an irrevocability about her former order, but to lessen his dissatisfaction and to silence his remonstrances about keeping full and particular accounts and to render the manner of receiving and disbursing her income more agreeable to him. I do not see, therefore, that the rights of the parties, as they existed previously, were materially changed by this act of hers of the 29th of June, 1835.

The original order which he offered to surrender appears to have found its way back into his hands and all things went on harmoniously between them until another year

had elapsed.  At this time (towards the last of July, 1836) fresh difficulties arose.  For causes either real or imaginary, which she has set out in her answer, she withdrew the agency of the estate from Mr. Halliday, the acting trustee, and took from him the duplicate of the order of the 15th of July, 1833, which had been deposited with him and appointed Mr. Brown agent of the estate in the place of Halliday ; and this change was made without previously notifying her husband of what she was about to do.  Of course it was a surprise upon him and he became greatly excited by it, so much so that he left their residence and took lodgings elsewhere.   Then, for the first time, the question seems to have come under discussion between them, whether the order she had recalled was revocable or irrevocable ; and it resulted, after a few days separation, in his writing a note addressed to Mr. Halliday and Mr. Monroe as trustees of the estate, dated 8th of August, 1836, in which she says that under Mrs. Cruger's assurance that she did not intend the order for the payment of the income to him to be irrevocable, he, of course, had not the right to have it so considered.   This removed at once all cause for his separating from her and he accordingly returned, having determined to meet her, as expressed in a letter to her at the time, upon her own terms, viz :  " trust in her confidence, affection, honor and generosity."   After this reconciliation the parties spent a part of the autumn of that year (1836) together at Henderson, their country residence, in Herkimer County, from whence they returned to the city some time in November.

The subject of this dependent condition was now again renewed as a matter of discussion between them attended by importunity and a course of conduct towards her (of which she complains) in order to induce her to make some settlement of income upon him by which he might be relieved from the state of dependence and uncertainty in which he was placed.   With a view to some arrangement to that effect, the friendly offices of Mr. Bard and Captain Whetten were accepted as arbitrators and their opinions and advice as to the basis of a settlement dividing the income were given, but without effect.   Nothing came of it or of certain papers which he caused to be prepared about

the same time and requested her to unite with him in executing, but which she refused to execute. Comparative peace and quietude, nevertheless, appears to have been restored to the minds of the parties at that period by a solemn declaration which she made in writing addressed to her sister Mrs. Monroe, under date of November 30, 1836. This paper embraced the most important points in the controversy between them. Mrs. Monroe gave it her sanction and approval Dec. 20, 1836, in these words: "I truly believe my sister in the declarations made in this letter and that she will strictly adhere to them throughout her life." Captain Whetten, also, expressed in writing his entire confidence in them.

From this time until the autumn of 1839, a period of about three years, the parties appear to have lived happily together, nothing having occurred to disturb the harmony between them. A portion of the years 1838 and 1839 was spent in Europe. On their return home they went to Henderson and passed the summer of 1839 at that place. In autumn, on coming to town, a difficulty again arose about the income in consequence of the dishonor of a draft which he had drawn on Brown, the agent, for money to pay debts or expenses incurred at Henderson, she having given some instructions to the agent which the agent supposed forbade his acceptance of the draft, though the draft was very soon afterwards accepted and paid. This circumstance induced a renewal of the importunities and demands upon her for a settlement which should place something irrevocable at the disposal of her husband. She was urged to this by her brother-in-law Mr. Monroe and she finally yielded so far as to sign an instrument addressed to Mr. Monroe dated 26th October 1839, by which she declared that her husband's power to draw the whole income as it accrued during his life should be deemed irrevocable; and this was followed up by executing a deed of the 2d of November 1839, which purported to settle upon her husband the whole income of the estate, real and personal, during his life, excepting the share which belonged to her of her deceased mother's and sister's estate. Upon this being done, the husband executed a deed of appointment on his part dated the 5th of the same month, referring to her

deed of the 2d, by which he directed the trustees to pay to her so much of the income as would, with what she had reserved herself, constitute one half of the whole income of the estate.

These instruments however proved entirely unavailing. She had intimated, at the time of executing the deed on her part, that her husband's acceptance of it would be the means of separating her from him. The declaration was made in pursuance of a determination long previously formed and never meant to be departed from, that if constrained to give him an irrevocable power over the income, she would not live with him while he held it. The prediction was verified, for on his coming to town, after exchanging the papers, he found that she had left their home and had gone to her brother's and that she refused to return and live with him so long as he retained the deed and claimed any rights under it.

This state of things continued until the 22d of February 1840 when he, being at Washington, endorsed upon the deed a surrender and cancellation of it and sent it to her. From Washington he proceeded to Charleston, South Carolina, where he remained until the following June. He then came back to New York and found she had gone to Henderson where she remained apart from him all the summer.

Now again the friendly advice of Mr. Bard was offered in a letter addressed to her expressive of much good feeling and concern for the happiness and honor of both and strongly urging her, for both their sakes, to make a settlement of some portion of the income upon her husband that should be permanent and irrevocable. She promptly replied to Mr. Bard's letter, placing at his disposal the whole of her then income so that he might decide what portion of it should be assigned irrevocably to Mr. Cruger and, after he had decided, then authorizing him to have the proper instrument prepared and forwarded to her for execution.

A deed of the 7th of September 1840 was accordingly prepared and sent to her which she executed and returned to Mr. Bard and the same was thereupon delivered to her husband. By this deed she assigned to him out of her income an annuity of three thousand dollars, to be paid to him dur-

ing his natural life. Notwithstanding this deed had all the appearance of being a perfectly free and voluntary act on her part and, as he says, was intended as an adjustment of all difficulties between them and to bring them together again, yet it would seem from her statements that she executed it without any view to cohabitation and that she still meant not to depart from her purpose of living separate provided he accepted the deed and should undertake to claim an irrevocable power over even so much of the income.

If such was her resolution at that time it is certain, however, that she did not long adhere to it. On his proceeding to Henderson soon after receiving the deed, she became reconciled and they were again united, so that in November following they came to town and took up their residence for the winter at her house 55 Broadway, where they continued to reside in external harmony until some time in June 1841.

Then it was that she again separated from him and they have not since resided together. The immediate cause of this their last separation does not very distinctly appear. A variety of circumstances may have contributed to it. Mrs. Monroe, who was present when she left, says it was owing to some misunderstanding about money matters—that neither she nor Mr. Cruger seemed to understand each other's views on money matters—that Mr. Cruger expressed his disapprobation of her going—opposed her going—but nevertheless handed her to her carriage.

But it is not very important at present to ascertain more particularly the cause. I only advert to the fact of their separation in connection with other prominent matters that have occurred since 1835 in relation to the husband's acquiring an interest in or a control over the income of her estate in order to come at that part of the case which I am now about to consider and upon which the right and claim of the husband to any interest or ownership in the property entirely depends. I refer to her deed of appointment of the 19th of November 1841, the last she ever executed and by which, according to its purport, she irrevocably assigns, transfers and appoints to her husband, in pursuance of the power contained in her post-nuptial settlement with him (meaning his deed of the 29th of June 1833) the one equal half part of the net income

1844.

CRUGER
v.
DOUGLAS.

of all her estate, real and personal, for and during the rest of his natural life from and after the first day of November then instant and directs the trustees of her estate to pay to her husband such moiety of the income accordingly, declaring the provision thereby made to be in lieu of the annuity of three thousand dollars. This deed is a matter of vital importance to the husband provided I am correct in my views as to the validity of the original deed of settlement and as to the effect of the order of the 15th of July 1833.

If found to be a valid instrument, both on the law and the facts of the case, then he is entitled to the aid of the court in carrying its provisions into effect. But, should it fail of support, so necessary to its validity, then there is nothing left for the husband to fall back upon within the province or jurisdiction of this court to enforce, unless indeed the court can reinstate the annuity which was surrendered when the deed in question was delivered; the grant of which annuity however is now as strongly impugned as is the deed which succeeded it. The form of this last instrument, as a deed of appointment, is not objected to, but it is insisted, in the first place, that she had not the capacity, legally, to make such a deed or any other instrument purporting to convey or to dispose of the income. The power as expressed in and intended to be conferred by the husband's original deed of settlement is broad enough to authorize her to dispose of the income as well as the principal either by deed or will and it is that sort of power which a married woman, notwithstanding coverture, is expressly authorized by the statute of powers to execute by herself without the presence or concurrence of her husband: 1 R. L. 735, sec. 110; Ib. 737, sec. 130.

But the objection lies deeper. It is based upon the disabling or prohibiting language of the 63d section of the statute of uses and trusts which, it is contended, renders her legally incompetent thus to part with or dispose of her income.

That section does indeed declare that "no person, beneficially interested in a trust for the receipt of the rents and profits of land, can assign or in any manner dispose of such interest;" though, where a trust for the payment of a sum

in gross is created, the right and interest of a beneficiary may be assigned.

This provision of the statute applies only to rents and profits or to sums in gross payable out of real estate, although, by a subsequent statutory provision, the income of personal property is placed on a similar footing and subjected to the like rules : *Clute* v. *Bool,* 8 Paige, 85.

The question is, therefore, presented, whether the deed in question is such an assignment or disposition of the income as the 63d section has prohibited and rendered nugatory ?

The law having authorized the creation of trusts and especially trusts for the purposes specified in the 3d and 4th subdivisions of sec. 55, it became necessary to throw around them some guard against an improvident disposition which the beneficiaries of such trusts might be tempted to make of what was intended for their continuous support and to meet their constantly accruing and future wants, such beneficiaries being generally persons of improvident habits or under some condition of helplessness or dependence ; and, hence, the 63d section was enacted. It was probably intended moreover to support and give effect to the clause against anticipation, commonly introduced into deeds and wills, creating settlements for the separate use of married women, as to the effect of which clause nice and difficult questions were liable frequently to arise. See Kent's Com. 5th ed. and *Tullett* v. *Armstrong,* 1 Beavan's Rep. 1.

No such clause appears however in the deed in the present case ; and the other branch of the mischief, which it was the policy of the 63d section to guard against, seems to be equally inapplicable and foreign to the present purpose. The effect of the deed, appointing one half of the net income of the husband, is not to break up the trust : for the object of the trust is not thereby essentially or materially changed. The trust is still to endure. The trustees are to go on receiving the rents and income and making the application thereof in moities according to the direction she has given and the appointment she has made—all of which is in conformity with the power conferred on her.

This is very different from a sale of her interest under the trust. It is not a parting with the continuous and constantly

accruing benefit it was intended to be to her, for a benefit in gross or an anticipation of all the benefit of the trust and a termination of it, so far as she is concerned.

The opinion expressed by the chancellor in *Gott* v. *Cook*, 7 Paige, 538 and by Mr. J. Cowen in S. C. in error, 24 Wend. 667, appears to me to favor the distinction which I make between putting an end to the original beneficiary's interest under the trust, thereby virtually defeating the object of it, and the doing of that which is only an appropriation of the benefits resulting from it in a manner compatible with its object and its creation. I think the latter is the sense in which this deed is to be regarded ; and, consequently, that it does not fall within the prohibition of the 63d section.

The other objections taken to the deed depend on the circumstances under which Mrs. Cruger was induced to execute it.

She states in her answer (and in her cross bill the charges are substantially repeated) that having returned to the city, on the 18th of October 1841 from her country residence, she went immediately to the house of her cousin, Mrs. Kane, where she met Mr. Cruger and had a very painful interview with him. That at that time, as she believes, he had made up his mind to live apart from her and to obtain as large a grant as practicable of her income and for this purpose he engaged the services of Mr. Monroe, her brother-in-law. That Mr. Monroe, accordingly, alone or conjointly with Mr. Cruger, instructed Mrs. Monroe, her only surviving sister, to procure from her an appointment of one half of the income to the use of Mr. Cruger. That all the acts and proceedings of Mr. Monroe to accomplish that object were guided by Mr. Cruger, either directly or indirectly through the agency of Mr. Monroe. At the same time, by some indirect means, Mr. Cruger procured Mrs. Kane and Mr. Ogden to aid and assist him in his designs upon the income. That Mrs. Monroe, aided and seconded by Mrs. Kane and Mr. Ogden, addressed her and requested that she would settle upon Mr. Cruger one half of the income of her estate. To this she replied that, by virtue of an offer made in June previously through her counsel Mr. Strong and still subsisting, Mr. Cruger had the liberty to take nearly the whole of the

income and it was, therefore, unnecessary to apply to her for a smaller sum. (The offer in June alluded to involved a condition that, if accepted, she would live separate from him and had, therefore, been rejected.) That her sister, Mrs. Monroe, treated such reply with ridicule and derision, stating that she had no right to give the whole but was bound, in order to save herself from general censure, to give one half. That Mrs. Monroe, so aided and seconded by Mrs. Kane and Mr. Ogden, pursued the application for a settlement of one half of the income upon Mr. Cruger so unceasingly and in so harassing and importunate a manner as to leave her no peace or quiet. That she resisted the importunities of her sister to the utmost of her ability; but at length her powers of resistance wholly failed her and she yielded to the requisition of her sister and directed her counsel (Mr. Strong) to draw the required settlement. She further says that Mr. Strong accordingly drew up an instrument bearing date the 26th of October 1841, purporting to settle one half of the income upon Mr. Cruger for her life, instead of his life, which she executed, but which he refused to accept or receive.

That in this stage of the controversy she was again addressed by her sister, aided by her cousin and Mr. Ogden—that she was charged with duplicity in giving private instructions to her counsel to draw the instrument in such unsatisfactory form and was censured for unreasonable obstinacy and threatened with public odíum; and with renewed and continual importunities, she was at last compelled in order to secure her tranquillity, to agree to make the settlement upon her husband of one half of the income during his life. That having so yielded, she sent for Mr. Strong and caused instructions to be given to him to prepare the deed of settlement accordingly. That the draft was prepared and submitted to Mr. Cruger, who instead of acquiescing in it, proposed a different deed of settlement, but on being informed that his proposed deed would not be executed, he finally, after considerable hesitation and on or about the 17th of November, signified to Mr. Strong that he would accept as satisfactory the deed prepared by him; whereupon it was engrossed and she executed and acknowledged it under date

of the 19th of November 1841 and sent it to Mr. Strong who delivered it to Mr. Cruger.

She then denies that Mrs. Monroe, Mrs. Kane and Mr. Ogden or either of them had any right to suppose that the deed could or would form a basis just, reputable or otherwise of a re-union between herself and her husband ; on the contrary she says it necessarily formed a cause of continued separation, inasmuch as she had uniformly declared that she could not live with her husband so long as he persevered in possessing himself of a legal right to any part of the income of her estate.

That in the summer previous he had declined to receive a settlement on the condition that she was to live apart from him and yet in order to secure the co-operation of her sister, and cousin and to avoid the odium of accepting a settlement on such disreputable terms he held out to her sister and cousin the idea that such settlement when made would satisfy his mind, restore harmony and thus lead to a re-union between them ; at the same time he well knew that she had determined not to live with him under such circumstances.

. She then says that the deed was not a free and voluntary act on her part—that it was obtained in opposition to her will and by the persevering and vexatious importunities of her husband and his agents—that it was obtained fraudulently against good faith and contrary to the true intent and meaning of what she claims to have been an ante-nuptial agreement and the husband's deed of 29th of June 1833. That although no physical force was employed to compel her to execute the instrument and admitting, as she does, that at the time of executing it she was under no personal restraint or duress and that she executed and acknowledged it with all the form and ceremony of a free and voluntary act, yet she says it was by undue persuasion and coercion growing out of his importunities and persecution of her for years and his threats that he would continue to destroy all her peace, comfort and happiness until she made such a settlement of her estate upon him as he should be content to accept, that she was brought to execute it.

Such are alleged to have been the means resorted to and practised upon her to obtain the deed. If true, there can be

no doubt as to the duty of this court in regard to the transaction. The deed could not be allowed to stand, much less would the court lend its aid in carrying it into effect. And here I may remark that much of what is thus alleged against the *morale* of the deed is either in denial of or responsive to statements put forth in the original bill calling for an answer under oath. The burthen of disproving these denials and responsive assertions therefore rests upon the husband and to this end he has called upon Mr. and Mrs. Monroe and Mr. Ogden for their testimony respecting the part taken by them as well as by Mr. Cruger himself in bringing about this arrangement and deed of settlement. Although these three witnesses are the persons chiefly implicated as conspiring with Mr. Cruger in this business, yet they are competent to testify and their testimony must be believed unless there is other evidence to refute their statements or upon the face of their own testimony it shall appear to be incredible.

Both Mr. and Mrs. Monroe freely admit in the course of a long and searching examination that often and on various occasions during a series of years prior to the separation of the parties in June 1841, they did interfere and by their advice and influence endeavored to prevail on Mrs. Cruger to make a permanent and irrevocable settlement upon Mr. Cruger of some large portion of the income of her estate. That this they urged upon her frequently when the subject of her income became a matter of discussion and controversy between them so as to threaten the loss of her domestic peace and happiness and to become painful to the feelings of those so nearly and dearly connected with her as were Mr. and Mrs. Monroe and family—that this was done both verbally and by written communications in the most urgent and persuasive manner, but was always most kindly meant, from a belief that her own happiness would be promoted by it and from a wish to see her placed upon high ground with respect to her husband and the opinion of the world.

When Mrs. Cruger came to town in October 1841 and did not go to reside with her husband at 55 Broadway, where he then was, these efforts were renewed by Mr. and Mrs. Monroe and particularly by the latter, in the hope of induc-

ing Mrs. Cruger to make the settlement and return to and
reside with her husband and thereby conform to the wishes
of her best friends.    Mrs. Monroe is asked upon her cross ex-
amination to give the substance of the conversation which it
appears she had with Mrs. Cruger on that subject two or
three times shortly after she came to town, partly at Mr.
Monroe's house, 30 Varick street, at one of which she thinks
Mr. Cruger was present and also Mrs. Kane and at another
Mr. Ogden and Mrs. Kane were present.   She says the con-
versations were not very long, at least not all of them.   She
did earnestly entreat her sister to make the deed and place
herself on high ground.    It was her sister she thought of, to
make right.   The conversation most deeply impressed on
her mind was one held in Mrs. Kane's house, when she said,
" My sister, only do right; put yourself on high ground and
divide your income with Henry, giving him half that you
cannot take back; then try and if you are not happy with
Henry and be not contented I will give him up and go to
you."   In answer to a further interrogatory she says she ex-
pressed herself to this effect: " Mrs. Kane, Mr. Ogden and
Mr. Whetten, every one of us that loves you, wishes you,
Harriet, to do this—do, Harriet, for all our sakes."   She fur-
ther says—" I did not say to her, ' You cannot maintain
your own respectability or that of your relatives without
making it;' I had no view but for my sister.   I urged her
from the bottom of my heart to do what I asked of her.   I
used no argument but affection."   In relation to the charge
that these efforts of Mrs. Monroe's to procure a deed from
her sister were stimulated by Mr. Cruger through the instru-
mentality or agency of Mr. Monroe, who instructed, guided
or directed his wife's movements in that respect, Mr. Mon-
roe expressly declares that Mr. Cruger never at any time
engaged his services or secured his agency to obtain for him
half of the income of Mrs. Cruger's estate or that he alone
conjointly with Mr. Cruger ever instructed or directed Mrs.
Monroe to procure from her sister such a grant.   He says,
that at no time whatever did anything pass between him-
self and Mr. Cruger on the subject, except when he spoke to
Mr. Cruger about having some arrangement made that
should be definite and unchangeable respecting the income—

at which times Mr. Cruger declared himself disposed to leave the whole matter to Mrs. Cruger and her friends. He says, moreover, that in the frequent conversations between himself and Mrs. Monroe he found that their views corresponded in relation to Mrs. Cruger ; and that he never did advise Mrs. Monroe to use her influence and power of persuasion with Mrs. Cruger to effect any object with her ; that Mrs. Monroe would attempt nothing of that sort which was not in accordance with her own views and her own feelings of affection towards her sister; that whatever he, Mr. Monroe, had done towards influencing or persuading Mrs. Cruger into a settlement, was done out of regard for her and her happiness ; and most generally without the knowledge or concurrence of Mr. Cruger, except that Mr. Cruger had always declared that he would cheerfully concur in anything her friends might decide upon.

It is unnecessary for the present purpose to go more at length into the testimony of these two witnesses.   What I have thus stated comprises the substance of all that I deem material to show the character and kind of influence which they appear to have exerted with Mr. Cruger in producing the result complained of by her.

The testimony of Mr. Ogden in regard to the character of his interference and advice is not very different.   He, it appears, was an old and intimate friend of the Douglas family. One who could have had no motive for advising Mrs. Cruger in any thing except that which he honestly and sincerely believed to be right and promotive of her happiness and welfare.   He was in New York during the whole of October and as late as the 10th of November 1841—on which day he embarked for England.   In October and at least a fortnight before he sailed, he met Mrs. Cruger at Mrs. Kane's in Varick street.   Mrs. Monroe was also there.   He had taken leave of the ladies.   Mrs. Cruger followed him to the door and as he was on the steps going away she urged him to return and converse with her on the subject of her existing difficulties with her husband and to give her advice.   At her pressing solicitation, resisting it, however, for some time, he agreed to listen to her story and did return into the house and had a long conversation with her.   Mrs. Kane and Mrs.

Monroe were present. The conversation most to the point, he says, was her declaration that she had always intended to settle the whole of her income upon her husband, revocable at her pleasure. He, Mr. Ogden, gave it as his opinion that a certain part of her income or a certain sum should in justice be settled on her husband during his life. After a great deal had been said, she agreed that the settlement should be of one half of her income and solemnly declared that she would carry it into effect. She said, "Mr. Ogden, I will sit down this very night and write orders to my solicitor to do so." He told her such haste was unnecessary, that to-morrow or the next day, after she had reflected on it, would answer the purpose. "I repeatedly told her," (he continues) "that my only cause for giving her this advice was my friendship to her and to set her right before the world. I told her that I frequently had heard it the subject of conversation and that she was blamed for the conduct she had pursued. We parted on this occasion on the most friendly terms."

He further says, on his cross-examination, that in the course of the conversation he told Mrs. Cruger that he was speaking to her as her friend and not as the advocate of Mr. Cruger, in whom he felt no comparative interest; that the advice he gave her was from a conviction in his own mind that it was right and that he gave it to her that she should be enabled to take a high stand before the world. In answer to the question, "Did you at that time advise that the settlement should be for his (Mr. Cruger's) life?" He says, "I did most distinctly;" and he was led to do so from a belief that no permanent amicable adjustment could be made which rested on the sole will or caprice of the party making the settlement.

It was in pursuance of this advice that Mrs. Cruger gave directions to Mr. Strong, her solicitor, to prepare the deed which was drawn and signed by her under date of the 26th of October 1841, purporting to be for her own life and which was rejected. Afterwards and on the 8th or 9th of November, Mr. Ogden had another interview with Mrs. Cruger at her brother's (Mr. William Douglas') house in Park Place. He there entered into a further conversation with her in which

he told her that he had understood a deed had been made out in favor of Mr. Cruger during her life and inquired whether she understood that to be the meaning of the advice he had given her. She replied that, in the directions to her solicitor, she had not ordered him to make out the papers in that way. He then remarked, in that case the solicitor was unworthy of her confidence, as he had presumed to make a change in her intentions. She persisted, however, that the papers should continue as they were drawn. On that account the conversation became an animated one. Mrs. Cruger was greatly excited, walked the room and expressed herself very strongly and in terms highly derogatory to the character of her brother-in-law, Mr. Monroe. To which the witness replied with some warmth, though in other respects, he says, he spoke plainly in the language of truth without passion or feeling. In reply to her exclamation that "all the world had turned against her and that I even had joined her enemies," he said, "No, Mrs. Cruger, you are your own worst enemy,—if any friend, however dear to you, ventures to differ in one single point from your opinion, you set them down at once as an enemy."

The witness says further, it was an angry conversation towards the close of it. It can hardly be said to have terminated amicably, for she persisted in her intentions and he had his views on the subject which were opposite to those entertained by her. Up to the time he parted with her, he understood that she did not yield her assent to making the settlement for his (Mr. Cruger's) life. Her brother, William Douglas, and Miss Bleecker were present during the conversation, but took no part in it of any moment.

With regard to the last interview, it appears to have been brought about solely at the instance and upon the invitation of Mrs. Cruger. Mr. Ogden did not seek it nor does it appear that Mrs. Kane, Mrs. Monroe or Mr. Cruger were at all privy to it. Mr. Ogden had shortly before heard, through Mrs. Kane or Mrs. Monroe or both of them (between the 1st and 8th of November) of the making and tender of the deed of the 26th of October and had expressed his astonishment at its being limited to her life, but has no recollection of having seen or conversed with Mr. Cruger on the subject be-

tween the time of the first and last conversations with Mrs. Cruger or of having seen Mr. Cruger and Mrs. Monroe together during that interval.

It appears moreover from his testimony, that in the summer of the preceding year (1840) he, Mr. Ogden, had visited Mrs. Cruger at Henderson upon her invitation and there the subject of a settlement and adjustment of the difficulties with her husband were discussed; and at which time he had very frankly expressed his opinion in favor of a settlement of a part of her income upon her husband that should be irrevocable as the only means of reconciling them and of enabling them to live amicably together and had advised her against making a settlement of the whole income during her pleasure as she repeatedly said it was her intention to do. To the question, "Did Mr. Cruger at any time request you to exert any influence with Mrs. Cruger on the subject of those difficulties?" The witness answers, "Never! It was at the solicitation of Mrs. Cruger alone and as her friend that I gave the advice." The question thus put and answered relates to every instance in which Mr. Ogden conversed with Mrs. Cruger and gave advice in relation to her difficulties and the best mode of settling and avoiding them in future. So far as he was instrumental in the matter and so far as his advice or opinions may have influenced her to make a settlement of one half of her income and to make that settlement irrevocable and that too for her husband's life instead of her own, Mr. Ogden certainly exculpates Mr. Cruger entirely from all agency in bringing that influence to bear on her mind. The same may be affirmed of the testimony of Mr. and Mrs. Monroe in respect to the part which they took either conjointly or separately to induce Mrs. Cruger to make such a settlement. Neither of the three acted with any view to serve any mere selfish purposes of Mr. Cruger by procuring for him one half of the income of the estate. It is impossible to believe that they who stood in the relation that these parties did to Mrs. Cruger, including Mrs. Kane her intimate friend and near relative, could have been actuated by such a motive even if they had not told us of higher and nobler motives of action proceeding from feelings of friendship and affection towards

Mrs. Cruger and from a desire to serve her in that which would contribute most to her welfare, her own domestic peace and happiness and secure to her the high stand which she had all along occupied in society and before the world and in the estimation of her numerous friends. To this end and from such motives they were induced to exert their influence and to persuade Mrs. Cruger to make such a deed of settlement as she finally executed. In so doing they appear to have been governed by considerations altogether personal to Mrs. Cruger, intending to benefit her, though at the same time it could not fail to benefit her husband; yet he was not nor were his interests the object of their solicitude. He was but a passive party, ready to abide by whatever should be done by her that her friends might sanction and approve.

It is true he was so far active as to reject the deed of the 26th of October, but that was because it was not in accordance with the agreement and the solemn promise she had made. It is true, moreover, that he proposed the form or draft of a deed such as he understood had been determined upon, but finding her unwilling to execute any other than her solicitor should prepare, he yielded and accepted the deed of the 19th of November. Under these circumstances can it be said that Mr. Cruger succeeded in obtaining it by undue means? That he took no active measures to obtain it seems to me abundantly proved; and the leading charge of the answer, that he enlisted her friends in his service, prevailed on them to interfere and exert their influence and, finally, through their instrumentality guiding and directing their movements, succeeded in bringing about the result, so far from being supported by any evidence is, in my judgment, completely disproved, not only by the positive testimony which I have quoted but by strong presumptive evidence which the circumstances of the case, the relations which the parties implicated stood in towards Mrs. Cruger and their highly respectable and honorable characters unquestionably furnish. There is no ground, therefore, for imputing to Mr. Cruger the exercise of any undue influence, coercion or misconduct in obtaining the deed, either by himself or through the medium of other persons instigated by him or whose officiousness he had secured.

The question still remains, however, whether executing the deed under the advice and pressing solicitations of her friends, urged upon her in the manner they have described and from motives like those before mentioned, she is at liberty to retract and avoid it?

In looking at the transaction with a view to this question it must not be forgotten that there was a dispute mainly attributable to the want of a formal and permanent marriage settlement. This dispute had before produced temporary separations; and now again it had resulted in a separation which threatened to be more lasting and in which the wife herself had chosen to be the party to leave her house and to keep herself aloof from her husband, he remaining ready to receive her whenever she might return. In the hope of bringing about a re-union and restoring harmony, her near relatives and other intimate and personal friends interpose their kind advice or she seeks advice from them. Their advice she determines to be governed by. She nevertheless waivers and at length recedes. Her friends chide and entreat and importune until she is brought back to her first resolve. She then executes the deed and acknowledges it in a deliberate manner before a proper officer and in the presence of a brother, who must have known most, if not all, of the circumstances which led to it; and he and a sister-in-law sanction the act by their subscription as witnesses. Her husband was not present to overawe her. Her importunate friends were not there surrounding her—one of whom was on his way to England. At that time she was free to act as she pleased; unconstrained, except so far as she may have felt bound in honor and conscience to fulfil the promise she had made to them or was afraid of again incurring their displeasure by refusing to execute the deed. If the former was the case, she can hardly be allowed to say that she executed it against her will and the convictions of her own mind; and the latter will avail but little as an excuse for one who is proved to be "remarkably pertinacious in her opinions, not easily persuaded and certainly not to be intimidated from them."

The deed, moreover, is but a reasonable settlement of this family matter. There is nothing inequitable or unconscio-

nable in its provisions. Such a deed, free from fraud, though a voluntary one, yet made with a view of effecting a family settlement, a court of equity will seek to uphold rather than to destroy for obvious reasons of public policy as well as for the sake of the peace of families.

This deed has not been attended with the good results which were expected from it by her friends but has rather had the effect, as it would seem, to estrange her the more from her husband and in some degree to sever the ties of friendship and affection between herself and sister, yet this furnishes no argument against the validity of the deed nor any sufficient ground for not giving immediate effect to it. All this may have proceeded from some idiosyncrasy of mind that time may overcome—and the day may possibly not be far distant when the object of her friends in recommending this deed of appointment may be fully realized, notwithstanding the assertion in her answer that they had no right to suppose it would form the basis of a re-union between her and her husband, since she had uniformly declared that his acceptance of an irrevocable power over any part of her estate or its income would be the cause of a continued separation on her part. A re-union, however, was but one of the objects they had in view. If that failed, there was another which would be accomplished by her settlement of one-half of the income upon her husband. It would show her generosity and magnanimity and in that respect " set her right before the world."

There is another point in respect to Mr. Cruger himself which must be briefly noticed. He is charged with obtaining the deed fraudulently and in bad faith, well knowing that it would not be the means of restoring harmony between them. This is answered by the evidence showing that he was but a passive party and had no hand in procuring it other than as a mere recipient when the deed was offered and sent to him. But the charge of fraud and bad faith goes farther. His mere acceptance of the deed and his attempt to claim any rights under it are alleged to be contrary to good faith and the true intent and meaning of an ante-nuptial agreement and the deed of the 29th June 1833 consequent upon it.

1844.

CRUGER
v.
DOUGLAS.

1844.

CRUGER
v.
DOUGLAS.

In the former part of this opinion I have expressed my belief that there was no ante-nuptial agreement by which the property and its income were to be settled exclusively upon and to the use of the wife; and it is sufficient to say, with respect to the husband's deed of the 29th June, that it contains in itself a power of appointment in the wife and that there can be no fraud or bad faith on his part in assuming or claiming rights purporting to be conferred upon him by any deed executed in pursuance of such power.

In examining this important and to the parties deeply interesting case, there are many facts and circumstances scattered throughout a large mass of testimony and numerous letters and papers made exhibits in the cause, which have given rise to much ingenious and elaborate discussion by the very able counsel on both sides. These have not escaped my attention; but it is unnecessary to present them here at length. They relate to matters which doubtless have had an influence upon the motives and actions of the parties in this unhappy domestic controversy and especially as inducing Mrs. Cruger to undertake the repudiation of her deed after having quietly acquiesced in and abided by its provisions for a considerable length of time. It has been strongly put by Mr. Cruger's counsel—and there is reason to believe from the evidence that this attempt is owing to the officious interference of an individual whose calling should have led him to holier and better purposes than the fomenting of domestic strife and the encouragement of devastating litigation; but with this I have nothing to do.(a)

A decree must be made establishing the deed of the 29th June 1833 and the deed of appointment of the 19th November 1841 and holding the trustees to accountability to Mr. Cruger for an equal moiety of the net income of the estate.

(a) The name of the minister here referred to no where appears in this opinion. The reporter deems it right to say this, because the names of clergymen are to be found in the course of this decision.